# WHITE, SECRETARY OF STATE OF TEXAS, ET AL. *v.* REGESTER ET AL.

No. 72–147.   Argued February 26, 1973—Decided June 18, 1973

WHITE, J., delivered the opinion of the Court, in Parts I, III, and IV of which all Members joined, and in Part II of which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST,

JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which DOUGLAS and MARSHALL, JJ., joined, *post,* p. 772.

*Leon Jaworski,* Special Assistant Attorney General of Texas, argued the cause for appellants. With him on the briefs were *John L. Hill,* Attorney General, *Larry York,* Executive Assistant Attorney General, *Alton F. Curry,* Special Assistant Attorney General, and *Lewis A. Jones,* Assistant Attorney General.

*David R. Richards* argued the cause for appellees Regester et al. With him on the brief were *Ronald L. Clower* and *James A. Mattox. Ed Idar, Jr.,* argued the cause for appellees Bernal et al. With him on the brief were *Mario Obledo, George J. Korbel,* and *Frank Hernandez. Thomas Gibbs Gee* argued the cause for appellees Willeford et al. With him on the brief was *William Terry Bray. J. Douglas McGuire* filed a brief for appellees Van Henry Archer, Jr., et al. *D. Marcus Ranger* and *E. Brice Cunningham* filed a brief for appellees Washington et al.*

MR. JUSTICE WHITE delivered the opinion of the Court.

This case raises two questions concerning the validity of the reapportionment plan for the Texas House of Representatives adopted in 1970 by the State Legislative Redistricting Board: First, whether there were unconstitutionally large variations in population among the districts defined by the plan; second, whether the multimember districts provided for Bexar and Dallas Counties were properly found to have been invidiously discriminatory against cognizable racial or ethnic groups in those counties.

---

*William A. Dobrovir* filed a brief for League of Women Voters of the United States et al. as *amici curiae* urging affirmance.

The Texas Constitution requires the state legislature to reapportion the House and Senate at its first regular session following the decennial census. Tex. Const., Art. III, § 28.[1] In 1970, the legislature proceeded to reapportion the House of Representatives but failed to agree on a redistricting plan for the Senate. Litigation

---

[1] Article III, § 28, of the Texas Constitution provides:

"The Legislature shall, at its first regular session after the publication of each United States decennial census, apportion the state into senatorial and representative districts, agreeable to the provisions of Sections 25, 26, and 26-a of this Article. In the event the Legislature shall at any such first regular session following the publication of a United States decennial census, fail to make such apportionment, same shall be done by the Legislature Redistricting Board of Texas, which is hereby created, and shall be composed of five (5) members, as follows: The Lieutenant Governor, the Speaker of the House of Representatives, the Attorney General, the Comptroller of Public Accounts and the Commissioner of the General Land Office, a majority of whom shall constitute a quorum. Said Board shall assemble in the City of Austin within ninety (90) days after the final adjournment of such regular session. The Board shall, within sixty (60) days after assembling, apportion the state into senatorial and representative districts, or into senatorial or representative districts, as the failure of action of such Legislature may make necessary. Such apportionment shall be in writing and signed by three (3) or more of the members of the Board duly acknowledged as the act and deed of such Board, and, when so executed and filed with the Secretary of State, shall have force and effect of law. Such apportionment shall become effective at the next succeeding statewide general election. The Supreme Court of Texas shall have jurisdiction to compel such Commission [Board] to perform its duties in accordance with the provisions of this section by writ of mandamus or other extraordinary writs conformable to the usages of law. The Legislature shall provide necessary funds for clerical and technical aid and for other expenses incidental to the work of the Board, and the Lieutenant Governor and the Speaker of the House of Representatives shall be entitled to receive per diem and travel expense during the Board's session in the same manner and amount as they would receive while attending a special session of the Legislature. This amendment shall become effective January 1, 1951. As amended Nov. 2. 1948."

was immediately commenced in state court challenging the constitutionality of the House reapportionment. The Texas Supreme Court held that the legislature's plan for the House violated the Texas Constitution.[2] *Smith* v. *Craddick,* 471 S. W. 2d 375 (1971). Meanwhile, pursuant to the requirements of the Texas Constitution, a Legislative Redistricting Board had been formed to begin the task of redistricting the Texas Senate. Although the Board initially confined its work to the reapportionment of the Senate, it was eventually ordered, in light of the judicial invalidation of the House plan, to also reapportion the House. *Mauzy* v. *Legislative Redistricting Board,* 471 S. W. 2d 570 (1971).

On October 15, 1971, the Redistricting Board's plan for the reapportionment of the Senate was released, and, on October 22, 1971, the House plan was promulgated. Only the House plan remains at issue in this case. That plan divided the 150-member body among 79 single-member and 11 multimember districts. Four lawsuits, eventually consolidated, were filed challenging the

---

[2] The Court held that the plan violated Art. III, § 26, of the Texas Constitution, which provides:

"The members of the House of Representatives shall be apportioned among the several counties, according to the number of population in each, as nearly as may be, on a ratio obtained by dividing the population of the State, as ascertained by the most recent United States census, by the number of members of which the House is composed; provided, that whenever a single county has sufficient population to be entitled to a Representative, such county shall be formed into a separate Representative District, and when two or more counties are required to make up the ratio of representation, such counties shall be contiguous to each other; and when any one county has more than sufficient population to be entitled to one or more Representatives, such Representative or Representatives shall be apportioned to such county, and for any surplus of population it may be joined in a Representative District with any other contiguous county or counties."

Board's Senate and House plans and asserting with respect to the House plan that it contained impermissible deviations from population equality and that its multimember districts for Bexar County and Dallas County operated to dilute the voting strength of racial and ethnic minorities.

A three-judge District Court sustained the Senate plan, but found the House plan unconstitutional. *Graves* v. *Barnes,* 343 F. Supp. 704 (WD Tex. 1972). The House plan was held to contain constitutionally impermissible deviations from population equality, and the multimember districts in Bexar and Dallas Counties were deemed constitutionally invalid. The District Court gave the Texas Legislature until July 1, 1973, to reapportion the House, but the District Court permitted the Board's plan to be used for purposes of the 1972 election, except for requiring that the Dallas County and Bexar County multimember districts be reconstituted into single-member districts for the 1972 election.

Appellants appealed the statewide invalidation of the House plan and the substitution of single-member for multimember districts in Dallas County and Bexar County.[3] MR. JUSTICE POWELL denied a stay of the judgment of the District Court, 405 U. S. 1201, and we noted probable jurisdiction *sub nom. Bullock* v. *Regester,* 409 U. S. 840.

I

We deal at the outset with the challenge to our jurisdiction over this appeal under 28 U. S. C. § 1253, which permits injunctions in suits required to be heard and determined by a three-judge district court to be ap-

---

[3] In a separate appeal, we summarily affirmed that portion of the judgment of the District Court upholding the Senate plan. *Archer* v. *Smith,* 409 U. S. 808 (1972).

pealed directly to this Court.[4] It is first suggested that the case was not one required to be heard by a three-judge court. The contention is frivolous. A statewide reapportionment statute was challenged and injunctions were asked against its enforcement. The constitutional questions raised were not insubstantial on their face, and the complaint clearly called for the convening of a three-judge court. That the court declared the entire apportionment plan invalid, but entered an injunction only with respect to its implementation for the 1972 elections in Dallas and Bexar Counties, in no way indicates that the case required only a single judge. Appellants are therefore properly here on direct appeal with respect to the injunction dealing with Bexar and Dallas Counties, for the order of the court directed at those counties was literally an order "granting . . . an . . . injunction in any civil action . . . required . . . to be heard and determined by a district court of three judges" within the meaning of § 1253.

We also hold that appellants, because they appealed from the entry of an injunction, are entitled to review of the District Court's accompanying declaration that the proposed plan for the Texas House of Representatives, including those portions providing for multimember districts in Dallas and Bexar Counties, was invalid statewide. This declaration was the predicate for the court's order requiring Dallas and Bexar Counties to be reapportioned into single districts; for its order that "unless the Legislature of the State of Texas on or before July 1, 1973, has adopted a plan to reapportion the legislative districts

---

[4] Title 28 U. S. C. § 1253 provides:

"Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges."

within the State in accordance with the constitutional guidelines set out in this opinion this Court will so reapportion the State of Texas"; and for its order that the Secretary of State "adopt and implement any and all procedures necessary to properly effectuate the orders of this Court in conformance with this Opinion . . . ." 343 F. Supp., at 737. In these circumstances, although appellants could not have directly appealed to this Court the entry of a declaratory judgment unaccompanied by any injunctive relief, *Gunn* v. *University Committee,* 399 U. S. 383 (1970); *Mitchell* v. *Donovan,* 398 U. S. 427 (1970), we conclude that we have jurisdiction of the entire appeal. *Roe* v. *Wade,* 410 U. S. 113 (1973); *Florida Lime & Avocado Growers* v. *Jacobsen,* 362 U. S. 73 (1960). With the Texas reapportionment plan before it, it was in the interest of judicial economy and the avoidance of piecemeal litigation that the three-judge District Court have jurisdiction over all claims raised against the statute when a substantial constitutional claim was alleged, and an appeal to us, once properly here, has the same reach. *Roe* v. *Wade, supra,* at 123; *Carter* v. *Jury Comm'n,* 396 U. S. 320 (1970); *Florida Lime & Avocado Growers* v. *Jacobsen, supra,* at 80.

## II

The reapportionment plan for the Texas House of Representatives provides for 150 representatives to be selected from 79 single-member and 11 multimember districts. The ideal district is 74,645 persons. The districts range from 71,597 to 78,943 in population per representative, or from 5.8% overrepresentation to 4.1% underrepresentation. The total variation between the largest and smallest district is thus 9.9%[5]

The District Court read our prior cases to require any deviations from equal population among districts to be

---

[5] See Appendix to opinion of the Court, *post,* p. 770.

justified by "acceptable reasons" grounded in state policy; relied on *Kirkpatrick* v. *Preisler,* 394 U. S.˙ 526 (1969), to conclude that the permissible tolerances suggested by *Reynolds* v. *Sims,* 377 U. S. 533 (1964), had been substantially eroded; suggested that *Abate* v. *Mundt,* 403 U. S. 182 (1971), in accepting total deviations of 11.9% in a county reapportionment was *sui generis;* and considered the "critical issue" before it to be whether "the State [has] justified any and all variances, however small, on the basis of a consistent, rational State policy." 343 F. Supp., at 713. Noting the single fact that the total deviation from the ideal between District 3 and District 85 was 9.9%, the District Court concluded that justification by appellants was called for and could discover no acceptable state policy to support the deviations. The District Court was also critical of the actions and procedures of the Legislative Reapportionment Board and doubted "that [the] board did the sort of deliberative job . . . worthy of judicial abstinence." *Id.,* at 717. It also considered the combination of single-member and multimember districts in the House plan "haphazard," particularly in providing single-member districts in Houston and multimember districts in other metropolitan areas, and that this "irrationality, without reasoned justification, may be a separate and distinct ground for declaring the plan unconstitutional."[6] *Ibid.*

---

[6] It may be, although we are not sure, that the District Court would have invalidated the plan statewide because of what it thought was an irrational mixture of multimember and single-member districts. Thus, in questioning the use of single-member districts in Houston but multimember districts in all other urban areas, and remarking that the State had provided neither "compelling" nor "rational" explanation for the differing treatment, the District Court merely concluded that this classification "may be" an independent ground for invalidating the plan. But there are no authorities in this Court for the proposition that the mere mixture of multimember and single-member districts in a single plan, even among urban areas, is in-

Finally, the court specifically invalidated the use of multi-member districts in Dallas and Bexar Counties as unconstitutionally discriminatory against a racial or ethnic group.

The District Court's ultimate conclusion was that "the apportionment plan for the State of Texas is unconstitutional as unjustifiably remote from the ideal of 'one man, one vote,' and that the multi-member districting schemes for the House of Representatives as they relate specifically to Dallas and to Bexar Counties are unconstitutional in that they dilute the votes of racial minorities." *Id.*, at 735.[7]

Insofar as the District Court's judgment rested on the conclusion that the population differential of 9.9% from the ideal district between District 3 and District 85 made out a prima facie equal protection violation under the Fourteenth Amendment, absent special justification, the court was in error. It is plain from *Mahan* v. *Howell,* 410 U. S. 315 (1973), and *Gaffney* v. *Cummings, ante,* p. 735, that state reapportionment statutes are not subject to the same strict standards applicable to reapportionment of congressional seats. *Kirkpatrick* v. *Preisler* did not dilute the tolerances contemplated by *Reynolds* v. *Sims* with respect to state districting, and we did not hold in *Swann* v. *Adams,* 385 U. S. 440 (1967), or *Kilgarlin* v. *Hill,* 386 U. S. 120 (1967), or

---

vidiously discriminatory, and we construe the remarks not as part of the District Court's declaratory judgment invalidating the state plan but as mere advance advice to the Texas Legislature as to what would or would not be acceptable to the District Court.

[7] The District Court also concluded, contrary to the assertions of certain plaintiffs, that the Senate districting scheme for Bexar County did not "unconstitutionally dilute the votes of any political faction or party." 343 F. Supp. 704, 735. The majority of the District Court also concluded that the Senate districting scheme for Harris County did not dilute black votes.

later in *Mahan* v. *Howell, supra,* that *any* deviations from absolute equality, however small, must be justified to the satisfaction of the judiciary to avoid invalidation under the Equal Protection Clause. For the reasons set out in *Gaffney* v. *Cummings, supra,* we do not consider relatively minor population deviations among state legislative districts to substantially dilute the weight of individual votes in the larger districts so as to deprive individuals in these districts of fair and effective representation. Those reasons are as applicable to Texas as they are to Connecticut; and we cannot glean an equal protection violation from the single fact that two legislative districts in Texas differ from one another by as much as 9.9%, when compared to the ideal district. Very likely, larger differences between districts would not be tolerable without justification "based on legitimate considerations incident to the effectuation of a rational state policy," *Reynolds* v. *Sims,* 377 U. S., at 579; *Mahan* v. *Howell, supra,* at 325, but here we are confident that appellees failed to carry their burden of proof insofar as they sought to establish a violation of the Equal Protection Clause from population variations alone. The total variation between two districts was 9.9%, but the average deviation of all House districts from the ideal was 1.82%. Only 23 districts, all single-member, were overrepresented or underrepresented by more than 3%, and only three of those districts by more than 5%. We are unable to conclude from these deviations alone that appellees satisfied the threshold requirement of proving a prima facie case of invidious discrimination under the Equal Protection Clause. Because the District Court had a contrary view, its judgment must be reversed in this respect.[8]

---

[8] The court's conclusion that the variations in this case were not justified by a rational state policy would, in any event, require re-

## III

We affirm the District Court's judgment, however, insofar as it invalidated the multimember districts in Dallas and Bexar Counties and ordered those districts to be redrawn into single-member districts. Plainly, under our cases, multimember districts are not *per se* unconstitutional, nor are they necessarily unconstitutional when used in combination with single-member districts in other parts of the State. *Whitcomb* v. *Chavis,* 403 U. S. 124 (1971); *Mahan* v. *Howell, supra;* see *Burns* v. *Richardson,* 384 U. S. 73 (1966); *Fortson* v. *Dorsey,* 379 U. S. 433 (1965); *Lucas* v. *Colorado General Assembly,* 377 U. S. 713 (1964); *Reynolds* v. *Sims, supra.*[9] But we have entertained claims that multimember districts are being used invidiously to cancel out or minimize the voting strength of racial groups. See *Whitcomb* v. *Chavis, supra; Burns* v. *Richardson, supra; Fortson* v. *Dorsey, supra.* To sustain such claims, it is not enough that the racial group al-

consideration and reversal under *Mahan* v. *Howell,* 410 U. S. 315 (1973). The Texas Constitution, Art. III, § 26, expresses the state policy against cutting county lines wherever possible in forming representative districts. The District Court recognized the policy but, without the benefit of *Mahan* v. *Howell,* may have thought the variations too great to be justified by that policy. It perhaps thought also that the policy had not been sufficiently or consistently followed here. But it appears to us that to stay within tolerable population limits it was necessary to cut some county lines and that the State achieved a constitutionally acceptable accommodation between population principles and its policy against cutting county lines in forming representative districts.

[9] See *Whitcomb* v. *Chavis,* 403 U. S. 124, 141–148 (1971), and the cases discussed in n. 22 of that opinion, including *Kilgarlin* v. *Hill,* 386 U. S. 120 (1967), where we affirmed the District Court's rejection of petitioners' contention that the combination of single-member, multimember, and floterial districts in a single reapportionment plan was "an unconstitutional 'crazy quilt.'" *Id.,* at 121.

legedly discriminated against has not had legislative seats in proportion to its voting potential. The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice. *Whitcomb* v. *Chavis, supra,* at 149–150.

With due regard for these standards, the District Court first referred to the history of official racial discrimination in Texas, which at times touched the right of Negroes to register and vote and to participate in the democratic processes. 343 F. Supp., at 725. It referred also to the Texas rule requiring a majority vote as a prerequisite to nomination in a primary election and to the so-called "place" rule limiting candidacy for legislative office from a multimember district to a specified "place" on the ticket, with the result being the election of representatives from the Dallas multimember district reduced to a head-to-head contest for each position. These characteristics of the Texas electoral system, neither in themselves improper nor invidious, enhanced the opportunity for racial discrimination, the District Court thought.[10] More fundamentally, it found that since Reconstruction days, there have been only two Negroes in the Dallas County delegation to the Texas House of Representatives and that these two were the only two Negroes ever slated by the Dallas Committee for Responsible Government (DCRG), a white-dominated organization that is in effective control of Democratic Party

---

[10] There is no requirement that candidates reside in subdistricts of the multimember district. Thus, all candidates may be selected from outside the Negro residential area.

candidate slating in Dallas County.[11] That organization, the District Court found, did not need the support of the Negro community to win elections in the county, and it did not therefore exhibit good-faith concern for the political and other needs and aspirations of the Negro community. The court found that as recently as 1970 the DCRG was relying upon "racial campaign tactics in white precincts to defeat candidates who had the overwhelming support of the black community." *Id.,* at 727. Based on the evidence before it, the District Court concluded that "the black community has been effectively excluded from participation in the Democratic primary selection process," *id.,* at 726, and was therefore generally not permitted to enter into the political process in a reliable and meaningful manner. These findings and conclusions are sufficient to sustain the District Court's judgment with respect to the Dallas multimember district and, on this record, we have no reason to disturb them.

## IV

The same is true of the order requiring disestablishment of the multimember district in Bexar County. Consistently with *Hernandez v. Texas,* 347 U. S. 475 (1954), the District Court considered the Mexican-Americans in Bexar County to be an identifiable class for Fourteenth Amendment purposes and proceeded to inquire whether the impact of the multimember district on this group constituted invidious discrimination. Surveying the historic and present condition of the Bexar County Mexican-American community, which is concen-

---

[11] The District Court found that "it is extremely difficult to secure either a representative seat in the Dallas County delegation or the Democratic primary nomination without the endorsement of the Dallas Committee for Responsible Government." 343 F. Supp., at 726.

trated for the most part on the west side of the city of San Antonio, the court observed, based upon prior cases and the record before it, that the Bexar community, along with other Mexican-Americans in Texas,[12] had long "suffered from, and continues to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others." 343 F. Supp., at 728. The bulk of the Mexican-American community in Bexar County occupied the Barrio, an area consisting of about 28 contiguous census tracts in the city of San Antonio. Over 78% of Barrio residents were Mexican-Americans, making up 29% of the county's total population. The Barrio is an area of poor housing; its residents have low income and a high rate of unemployment. The typical Mexican-American suffers a cultural and language barrier [13] that makes his participation in community processes extremely difficult, particularly, the court thought, with respect to the political life of Bexar County. "[A] cultural incompatability . . . conjoined with the poll tax and the most restrictive voter registration procedures in the nation have operated to effectively deny Mexican-Americans access to the political processes in Texas even longer than the Blacks were formally denied access by the white primary." 343 F. Supp., at 731. The residual impact of this history reflected itself in the fact that Mexican-American voting registration remained very poor in the county and that only five Mexican-Americans since 1880 have served in the Texas Legislature from

---

[12] Mexican-Americans constituted approximately 20% of the population of the State of Texas.

[13] The District Court found that "[t]he fact that [Mexican-Americans] are reared in a sub-culture in which a dialect of Spanish is the primary language provides permanent impediments to their educational and vocational advancement and creates other traumatic problems." 343 F. Supp., at 730.

Bexar County. Of these, only two were from the Barrio area.[14] The District Court also concluded from the evidence that the Bexar County legislative delegation in the House was insufficiently responsive to Mexican-American interests.

Based on the totality of the circumstances, the District Court evolved its ultimate assessment of the multi-member district, overlaid, as it was, on the cultural and economic realities of the Mexican-American community in Bexar County and its relationship with the rest of the county. Its judgment was that Bexar County Mexican-Americans "are effectively removed from the political processes of Bexar [County] in violation of all the *Whitcomb* standards, whatever their absolute numbers may total in that County." *Id.*, at 733. Single-member districts were thought required to remedy "the effects of past and present discrimination against Mexican-Americans," *ibid.*, and to bring the community into the full stream of political life of the county and State by encouraging their further registration, voting, and other political activities.

The District Court apparently paid due heed to *Whitcomb* v. *Chavis, supra,* did not hold that every racial or political group has a constitutional right to be represented in the state legislature, but did, from its own special vantage point, conclude that the multimember district, as designed and operated in Bexar County, invidiously excluded Mexican-Americans from effective participation in political life, specifically in the election of representatives to the Texas House of Representatives. On the record before us, we are not inclined to overturn these findings, representing as they do a blend of history and an intensely local appraisal of the design and impact of

---

[14] Two other residents of the Barrio, a Negro and an Anglo-American, have also served in the Texas Legislature.

the Bexar County multimember district in the light of past and present reality, political and otherwise.

*Affirmed in part, reversed in part, and remanded.*

## APPENDIX TO OPINION OF THE COURT

The Redistricting Board's plan embodied the following districts:

| District | Population | Average Multi-member | (Under) Over | Percent Deviation Over (Under) |
|---|---|---|---|---|
| 1 | 76,285 | | 1,640 | 2.2 |
| 2 | 77,102 | | 2,457 | 3.3 |
| 3 | 78,943 | | 4,298 | 5.8 |
| 4 | 71,928 | | (2,717) | (3.6) |
| 5 | 75,014 | | 369 | .5 |
| 6 | 76,051 | | 1,406 | 1.9 |
| 7 (3) | 221,314 | 73,771 | ( 874) | (1.2) |
| 8 | 74,303 | | ( 342) | ( .5) |
| 9 | 76,813 | | 2,168 | 2.9 |
| 10 | 72,410 | | (2,235) | (3.0) |
| 11 | 73,136 | | (1,509) | (2.0) |
| 12 | 74,704 | | 59 | .1 |
| 13 | 75,929 | | 1,284 | 1.7 |
| 14 | 76,597 | | 1,952 | 2.6 |
| 15 | 76,701 | | 2,056 | 2.8 |
| 16 | 74,218 | | ( 427) | ( .6) |
| 17 | 72,941 | | (1,704) | (2.3) |
| 18 | 77,159 | | 2,514 | 3.4 |
| 19 (2) | 150,209 | 75,104 | 459 | .6 |
| 20 | 75,592 | | 947 | 1.3 |
| 21 | 74,651 | | 6 | .0 |
| 22 | 73,311 | | (1,334) | (1.8) |
| 23 | 75,777 | | 1,132 | 1.5 |
| 24 | 73,966 | | ( 679) | ( .9) |
| 25 | 75,633 | | 988 | 1.3 |
| 26 (18) | 1,327,321 | 73,740 | ( 905) | (1.2) |
| 27 | 77,788 | | 3,143 | 4.2 |
| 28 | 72,367 | | (2,278) | (3.1) |
| 29 | 76,505 | | 1,860 | 2.5 |
| 30 | 77,008 | | 2,363 | 3.2 |
| 31 | 75,025 | | 380 | .5 |
| 32 (9) | 675,499 | 75,055 | 410 | .5 |
| 33 | 73,071 | | (1,574) | (2.1) |
| 34 | 76,071 | | 1,426 | 1.9 |
| 35 (2) | 147,553 | 73,777 | ( 868) | (1.2) |
| 36 | 74,633 | | ( 12) | ( .0) |
| 37 (4) | 295,516 | 73,879 | ( 766) | (1.0) |

| District | Population | Average Multi-member | (Under) Over | Percent Deviation Over (Under) |
|---|---|---|---|---|
| 38 | 78,897 | | 4,252 | 5.7 |
| 39 | 77,363 | | 2,718 | 3.6 |
| 40 | 71,597 | | (3,048) | (4.1) |
| 41 | 73,678 | | ( 967) | (1.3) |
| 42 | 74,706 | | 61 | .1 |
| 43 | 74,160 | | ( 485) | ( .6) |
| 44 | 75,278 | | 633 | .8 |
| 45 | 78,090 | | 3,445 | 4.6 |
| 46 (11) | 826,698 | 75,154 | 509 | .7 |
| 47 | 76,319 | | 1,674 | 2.2 |
| 48 (3) | 220,056 | 73,352 | (1,293) | (1.7) |
| 49 | 76,254 | | 1,609 | 2.2 |
| 50 | 74,268 | | ( 377) | ( .5) |
| 51 | 75,800 | | 1,155 | 1.5 |
| 52 | 76,601 | | 1,956 | 2.6 |
| 53 | 74,499 | | ( 146) | ( .2) |
| 54 | 77,505 | | 2,860 | 3.8 |
| 55 | 76,947 | | 2,302 | 3.1 |
| 56 | 74,070 | | ( 575) | ( .8) |
| 57 | 77,211 | | 2,566 | 3.4 |
| 58 | 75,120 | | 475 | .6 |
| 59 (2) | 144,995 | 72,497 | (2,148) | (2.9) |
| 60 | 75,054 | | 409 | .5 |
| 61 | 73,356 | | (1,289) | (1.7) |
| 62 | 72,240 | | (2,405) | (3.2) |
| 63 | 75,191 | | 546 | .7 |
| 64 | 74,546 | | ( 99) | ( .1) |
| 65 | 75,720 | | 1,075 | 1.4 |
| 66 | 72,310 | | (2,335) | (3.1) |
| 67 | 75,034 | | 389 | .5 |
| 68 | 74,524 | | ( 121) | ( .2) |
| 69 | 74,765 | | 120 | .2 |
| 70 | 77,827 | | 3,182 | 4.3 |
| 71 | 73,711 | | ( 934) | (1.3) |
| 72 (4) | 297,770 | 74,442 | ( 203) | ( .3) |
| 73 | 74,309 | | ( 336) | ( .5) |
| 74 | 73,743 | | ( 902) | (1.2) |
| 75 (2) | 147,722 | 73,861 | ( 784) | (1.1) |
| 76 | 76,083 | | 1,438 | 1.9 |
| 77 | 77,704 | | 3,059 | 4.1 |
| 78 | 71,900 | | (2,745) | (3.7) |
| 79 | 75,164 | | 519 | .7 |
| 80 | 75,111 | | 466 | .6 |
| 81 | 75,674 | | 1,029 | 1.4 |
| 82 | 76,006 | | 1,361 | 1.8 |

| District | Population | Average Multi-member | (Under) Over | Percent Deviation Over (Under) |
|---|---|---|---|---|
| 83 | 75,752 | | 1,107 | 1.5 |
| 84 | 75,634 | | 989 | 1.3 |
| 85 | 71,564 | | (3,081) | (4.1) |
| 86 | 73,157 | | (1,488) | (2.0) |
| 87 | 73,045 | | (1,600) | (2.1) |
| 88 | 75,076 | | 431 | .6 |
| 89 | 74,206 | | ( 439) | ( .6) |
| 90 | 74,377 | | ( 268) | ( .4) |
| 91 | 73,381 | | (1,264) | (1.7) |
| 92 | 71,908 | | (2,737) | (3.7) |
| 93 | 72,761 | | (1,884) | (2.5) |
| 94 | 73,328 | | (1,317) | (1.8) |
| 95 | 73,825 | | ( 820) | (1.1) |
| 96 | 72,505 | | (2,140) | (2.9) |
| 97 | 74,202 | | ( 443) | ( .6) |
| 98 | 72,380 | | (2,265) | (3.0) |
| 99 | 74,123 | | ( 522) | ( .7) |
| 100 | 75,682 | | 1,037 | 1.4 |
| 101 | 75,204 | | 559 | .7 |

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting in No. 71–1476, *ante*, p. 735, and concurring in part and dissenting in part in No. 72–147.

The Court today upholds statewide legislative apportionment plans for Connecticut and Texas, even though these plans admittedly entail substantial inequalities in the population of the representative districts, and even though the States have made virtually no attempt to justify their failure "to construct districts . . . as nearly of equal population as is practicable." *Reynolds* v. *Sims*, 377 U. S. 533, 577 (1964). In reaching this conclusion, the Court sets aside the judgment of the United States District Court for the District of Connecticut holding the Connecticut plan invalid, and the judgment of the United States District Court for the Western Dis-

trict of Texas reaching a similar result as to the Texas plan. In the Texas case, the Court does affirm, however, the District Court's determination that the use of multi-member districts in Dallas and Bexar Counties had the unconstitutional effect of minimizing the voting strength of racial groups.[1] See *Whitcomb* v. *Chavis,* 403 U. S. 124, 142–144 (1971); *Burns* v. *Richardson,* 384 U. S. 73, 88 (1966); *Fortson* v. *Dorsey,* 379 U. S. 433, 439 (1965). With that latter conclusion I am in full agreement, as I also agree with and join Part I of the Court's opinion in No. 72–147, *White* v. *Regester.* But the decision to uphold the state apportionment schemes reflects a substantial and very unfortunate retreat from the principles established in our earlier cases, and I therefore must state my dissenting views.

I

At issue in No. 71–1476, *Gaffney* v. *Cummings,* is the 1971 reapportionment plan for election of members of the House of Representatives of Connecticut. The plan was premised on a 151-member House, with each member elected from a single-member district. Since the population of the State was 3,032,217, according to 1970 census data, the ideal would fix the population of each district at 20,081. In fact, the population of many

---

[1] In *Fortson* v. *Dorsey,* 379 U. S. 433 (1965), we held that a multimember district is not *per se* unconstitutional under the Equal Protection Clause, even though we had previously recognized certain inherently undesirable features of the device. See *Lucas* v. *Colorado General Assembly,* 377 U. S. 713, 731 n. 21 (1964). We have concluded, however, that the use of the device is, in fact, unconstitutional, where it operates to " 'minimize or cancel out the voting strength of racial or political elements of the voting population,' " *Burns* v. *Richardson,* 384 U. S. 73, 88 (1966), quoting from *Fortson* v. *Dorsey, supra,* at 439. Today's decision is the first in which we have sustained an attack on the use of multimember districts. Cf. *Whitcomb* v. *Chavis,* 403 U. S. 124, 144 (1971).

districts deviated substantially from the ideal, ranging from a district underrepresented by 3.93% to one over-represented by 3.9%. The total spread of deviation—a figure deemed relevant in each of our earlier decisions—was 7.83%. The population of 39 assembly districts deviated from the average by more than 3%. Another 34 districts deviated by more than 2%. The average deviation was just under 2%. To demonstrate that the state plan did not achieve the greatest practicable degree of equality in per-district population, appellees submitted a number of proposed apportionment plans, including one that would have significantly reduced the extent of inequality. The total range of deviation under appellees' plan would have been 2.61%, as compared to 7.83% under the state plan.

The District Court held the state plan invalid on the ground that "the deviations from equality of populations of the . . . House districts are not justified by any sufficient state interest." [2]  341 F. Supp. 139, 148 (Conn. 1972). Instead of adopting one of appellees' plans, the court appointed a Special Master to chart a new plan, and his effort produced a scheme with a total range of deviation of only 1.16%. In overturning the District Court's decision, the Court does not conclude, as it did earlier this Term in *Mahan* v. *Howell,* 410 U. S. 315 (1973), that the District Court failed to discern the State's sufficient justification for the deviations. Indeed, in view of appellant's halfhearted attempts to justify

---

[2] With regard to the senatorial districts, the 1971 plan produced a total variance of 1.81%. Although appellees did not specifically challenge the apportionment of senatorial districts, the District Court properly concluded that its finding of unconstitutional deviation in one house required invalidation of the entire apportionment plan. *Maryland Committee for Fair Representation* v. *Tawes,* 377 U. S. 656, 673 (1964); *Lucas* v. *Colorado General Assembly, supra,* at 735. *Burns* v. *Richardson, supra,* at 83.

the deviations at issue here, such a conclusion could hardly be supported. Whereas the Commonwealth of Virginia made a substantial effort to draw district lines in conformity with the boundaries of political subdivisions—an effort that was found sufficient in *Mahan* v. *Howell* to validate a plan with total deviation of 16.4%—the evidence in the case before us requires the conclusion that Connecticut's apportionment plan was drawn in complete disregard of political subdivision lines. The District Court pointed out that "[t]he boundary lines of 47 towns are cut under the Plan so that one or more portions of each of these 47 towns are added to another town or a portion of another town to form an assembly district." 341 F. Supp., at 142. Moreover, the boundary lines of 29 of these 47 towns were cut more than once, and the plan created "78 segments of towns in the formation of 151 assembly districts." *Ibid.*

Although appellant failed to offer cogent reasons in explanation of the substantial variations in district population, the Court nevertheless upholds the state plan. The Court reasons that even in the absence of any explanation for the failure to achieve equality, the showing of a total deviation of almost 8% does not make out a prima facie case of invidious discrimination under the Fourteenth Amendment. Deviations no greater than 8% are, in other words, to be deemed *de minimis,* and the State need not offer any justification at all for the failure to approximate more closely the ideal of *Reynolds* v. *Sims, supra.*

The Texas reapportionment case, No. 72–147, *White* v. *Regester,* presents a similar situation, except that the range of deviation in district population is greater and the State's justifications are, if anything, more meager. An ideal district in Texas, which chooses the 150 members of the State House of Representatives from 79 single-member and 11 multimember districts, is 74,645. As

defined in the State's 1970 plan, a substantial number of districts departed significantly from the ideal. The total range of deviation was at least 9.9%, and arguably almost 30%, depending on the mode of calculation.[3] The District Court pointed out that

> "[i]n all of the evidence presented in this case, the State has not attempted to explain in terms of rational State policy its failure to create districts equal in population as nearly as practicable, nor has the State sought to justify a single deviation from precise mathematical equality. The lengthy depositions of the members of the legislative redistricting board and of the staff members who did the actual drawing of the legislative district lines are devoid of any meaningful indications of the standards used." 343 F. Supp. 704, 714 (WD Tex. 1972).

As the District Court's opinion makes clear, the variations surely cannot be defended as a necessary byproduct of a state effort to avoid fragmentation of political subdivisions. Nevertheless, the Court today sets aside the District Court's decision, reasoning, as in the Connecticut case, that a showing of as much as 9.9% total deviation still does not establish a prima facie case under the Equal Protection Clause of the Fourteenth Amendment. Since the Court expresses no misgivings about our recent decision in *Abate* v. *Mundt,* 403 U. S. 182 (1971), where we held that a total deviation of 11.9% must be

---

[3] The District Court pointed out that "the State's method of computing deviations in the multi-member districts may distort the actual percentage deviations in those eleven districts. . . . Since we have concluded that the 9.9% total deviation is not the result of a good faith attempt to achieve population equality as nearly as practicable, it is unnecessary for us to resolve this complex computational conflict." 343 F. Supp. 704, 713 n. 5. A similar conflict existed in *Mahan* v. *Howell,* 410 U. S. 315 (1973), as I pointed out in my dissenting opinion, *id.,* at 333, and there too the Court declined to indicate any awareness of the dispute.

justified by the State, one can reasonably surmise that a line has been drawn at 10%—deviations in excess of that amount are apparently acceptable only on a showing of justification by the State; deviations less than that amount require no justification whatsoever.

## II

The proposition that certain deviations from equality of district population are so small as to lack constitutional significance, while repeatedly urged on this Court by States that failed to achieve precise equality, has never before commanded a majority of the Court.[4]  Indeed, in *Kirkpatrick* v. *Preisler,* 394 U. S. 526, 530 (1969), we expressly rejected the argument

> "that there is a fixed numerical or percentage population variance small enough to be considered *de minimis* and to satisfy without question the 'as nearly as practicable' standard.  The whole thrust of the 'as nearly as practicable' approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case."

The Court reasons, however, that *Kirkpatrick* v. *Preisler,*

---

[4] There is a statement, to be sure, in *Swann* v. *Adams,* 385 U. S. 440, 444 (1967), that "[d]e minimis deviations are unavoidable," but that statement must be viewed in context.  By way of clarification, the Court immediately added that "the *Reynolds* opinion limited the allowable deviations to those minor variations which 'are based on legitimate considerations incident to the effectuation of a rational state policy.' 377 U. S. 533, 579." *Ibid.* Similarly, the Court noted, quoting from *Roman* v. *Sincock,* 377 U. S. 695, 710 (1964), that "the Constitution permits 'such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination.'" 385 U. S., at 444. *Swann* v. *Adams* does not, in my view, suggest any support for the proposition that deviations as great as 10% are tolerable in the absence of any justification or explanation by the State.

*supra,* a case that concerned the division of Missouri into congressional districts, has no application to the apportionment of seats in a state legislature. In my dissenting opinion in *Mahan* v. *Howell, supra,* I pointed out that the language, reasoning, and background of the *Kirkpatrick* decision all command the conclusion that our holding there is applicable to state legislative apportionment no less than to congressional districting. In fact, this Court specifically recognized as much in the context of a challenge to an Arizona apportionment scheme in *Ely* v. *Klahr,* 403 U. S. 108 (1971). Describing the opinion of the District Court whose judgment was under review, we noted that the court below had "properly concluded that this plan was invalid under *Kirkpatrick* v. *Preisler,* 394 U. S. 526 (1969), and *Wells* v. *Rockefeller,* 394 U. S. 542 (1969), since the legislature had operated on the notion that a 16% deviation was *de minimis* and consequently made no effort to achieve greater equality." 403 U. S., at 111. Yet it is precisely such a notion that the Court today approves.[5]

Moreover, even if *Kirkpatrick* should be deemed inapplicable to the apportionment of state legislative districts, the reasoning that gave rise to our rejection of a

---

[5] By contrast, in *Mahan* v. *Howell, supra,* the Court expressly reaffirmed the holding of *Reynolds* v. *Sims,* 377 U. S. 533 (1964), that "some deviations from the equal-population principle are constitutionally permissible" "[s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy." *Id.,* at 579, quoted in *Mahan* v. *Howell, supra,* at 325 (emphasis added). In my view, the Court incorrectly concluded in *Mahan* v. *Howell* that Virginia had justified the population variations at issue there. Nevertheless, the Court did follow the line of analysis prescribed in our earlier decisions—requiring the State to justify every deviation from precise equality. The approach of *Mahan* is, therefore, directly at odds with the approach adopted today. See also, *e. g., Abate* v. *Mundt,* 403 U. S. 182, 185 (1971); *Kilgarlin* v. *Hill,* 386 U. S. 120, 122 (1967); *Swann* v. *Adams, supra,* at 443–446.

*de minimis* approach is fully applicable to the case before us. We pointed out there that the "as nearly as practicable" standard—the standard that controls legislative apportionment as well as congressional districting, *Reynolds* v. *Sims, supra,* at 577—demands that "the State make a good-faith effort to achieve precise mathematical equality. . . . Equal representation for equal numbers of people is a principle designed to prevent debasement of voting power and diminution of access to elected representatives. Toleration of even small deviations detracts from these purposes." 394 U. S., at 530–531. *Kirkpatrick* recognized that "to consider a certain range of variances *de minimis* would encourage legislators to strive for that range rather than for equality as nearly as practicable." 394 U. S., at 531.

Although not purporting to quarrel with the principle that precise mathematical equality is the constitutionally mandated goal of reapportionment, the Court today establishes a wide margin of tolerable error, and thereby undermines the effort to effectuate the principle. For it is clear that the state legislatures and the state and federal courts have viewed *Kirkpatrick* as controlling on the issue of legislative apportionment, and the outgrowth of that assumption has been a truly extraordinary record of compliance with the constitutional mandate. Appellees in No. 71–1476 make the point forcefully by comparing the extent of inequality in the population of legislative districts prior to 1969, the year of our decision in *Kirkpatrick,* with the extent of inequality in subsequent years.[6] Prior to 1969, the range of variances in population of state senatorial districts exceeded 15% in 44 of the 50 States. Three States had

---

[6] Appellees' figures are compiled from a table entitled Apportionment of Legislatures, in 17 Council of State Governments, the Book of the States: 1968–1969, pp. 66–67 (1968), and from Council of State Governments, Reapportionment in the Seventies (1973).

reduced the total variance to between 10% and 15%; two had cut the variance to between 5% and 10%; only one had reduced the variance below 5%. The record of apportionment of state House districts was even less encouraging. Variances in excess of 15% characterized all but two of the States, and only one of these had brought the total variance under 10%. The improvement in the post-1969 years could not have been more dramatic. The table provided by appellees, set out in full in the margin,[7] reveals that in almost one-half of the States the total variance in population of senatorial districts was within 5% to zero. Of the 45 States as to which information was available, 32 had reduced the total variance below 10% and only eight had failed to bring the total variance below 15%. With regard to House districts the improvement is similar. On the basis of information concerning 42 States, it appears that 20 had achieved a total variance of less than 5%, and only 14 retained districts with a total variance of more than 15% from the constitutional ideal.

To appreciate the significance of this encouraging development, it is important to understand that the demand for precise mathematical equality rests neither on

---

[7]

Deviations After 1970

| Range of Deviations | Number of States | Percentage of States |
|---|---|---|
| Senate: | | |
| Under 1% | 3 | 6.7% |
| 1–5% | 21 | 46.7% |
| 5–10% | 8 | 17.8% |
| 10–15% | 5 | 11.1% |
| Over 15% | 8 | 17.8% |
| House: | | |
| Under 1% | 4 | 9.5% |
| 1–5% | 16 | 38.1% |
| 5–10% | 8 | 19.1% |
| 10–15% | 4 | 9.5% |
| Over 15% | 10 | 23.8% |

a scholastic obsession with abstract numbers nor a rigid insensitivity to the political realities of the reapportionment process. Our paramount concern has remained an individual and personal right—the right to an equal vote. "While the result of a court decision in a state legislative apportionment controversy may be to require the restructuring of the geographical distribution of seats in a state legislature, the judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote." *Reynolds* v. *Sims, supra,* at 561. We have demanded equality in district population precisely to insure that the weight of a person's vote will not depend on the district in which he lives. The conclusion that a State may, without any articulated justification, deliberately weight some persons' votes more heavily than others, seems to me fundamentally at odds with the purpose and rationale of our reapportionment decisions. Regrettably, today's decisions are likely to jeopardize the very substantial gains that have been made during the last four years.

Moreover, if any approach ascribes too much importance to abstract numbers and too little to the realities of malapportionment, it is not *Kirkpatrick*'s demand for precise equality in district population, but rather the Court's own *de minimis* approach. By establishing an arbitrary cutoff point expressed in terms of total percentage variance from the constitutional ideal, the Court fails to recognize that percentage figures tend to hide the total number of persons affected by unequal weighting of votes. In the Texas case, for example, the District Court pointed out that

"the total deviations for Dallas and Bexar Counties, respectively, amount to about 16,000 people and 5,500 people, for a total of around 21,500 people.

> The percentage deviation figures are only a short-hand method of expressing the 'loss,' dilution, or disproportionate weighting of votes. Just as the Court in *Reynolds* concluded that legislators represent people, not trees or cows, so we would emphasize that legislators represent people, not percentages of people." 343 F. Supp., at 713 n. 5.

Finally, it is no answer to suggest that precise mathematical equality is an unsatisfactory goal in view of the inevitable inaccuracies of the census data on which the plans are based. That argument, which we implicitly rejected in *Kirkpatrick* v. *Preisler, supra,*[8] mixes two distinct questions. In the first place, a state apportionment plan must be grounded on the most accurate available data, and the unreliability of the data may itself necessitate the invalidation of the plan. But once the data are established, the State's constitutional obligation is to achieve the highest practicable degree of equality with reference to the information at hand. In my view, the District Courts properly concluded that neither Texas nor Connecticut had satisfied this obligation. I would therefore affirm both judgments.

---

[8] See 394 U. S., at 538–540 (1969) (Fortas, J., concurring); *Wells* v. *Rockefeller,* 394 U. S. 542, 554 (1969) (WHITE, J., dissenting).