Charley WILSON et al., Plaintiffs,

v.

L. Ray VAHUE et al., Defendants.

Civ. A. No. CA-2-75-13.

United States District Court,
N. D. Texas,
Amarillo Division.

Nov. 4, 1975.

**60**

Selden B. Hale, Amarillo, Tex., for plaintiffs.

J. Bruce Aycock, City Atty., Harlow·Sprouse, of Underwood, Wilson, Sutton, Berry, Stein & Johnson, Amarillo, Tex., for defendants.

High Plains Women's Political Caucus, Elsie Brown Silverman, Amarillo, Tex., amicus curiae.

## MEMORANDUM

WOODWARD, District Judge.

The above case was tried before the court without a jury commencing on the 13th day of October, 1975 in Amarillo, Texas with all parties and their attorneys present. After each side had presented their evidence and the court had received and considered the arguments and briefs of counsel, this memorandum opinion is filed which shall constitute the court's findings of fact and conclusions of law. There is included in the findings of fact the stipulations of the parties as contained in Paragraph III of the pre-trial order approved by all attorneys and entered by the court on October 10, 1975.

The plaintiffs are individuals, residents of the City of Amarillo, Texas, and are qualified voters.

The plaintiffs have not alleged a class action nor have they sought permission to proceed as representatives of a class pursuant to Rule 23, Federal Rules of Civil Procedure. It is the contention·of the plaintiffs that they have been denied equal protection of the laws and due process as guaranteed by the Fourteenth and Fifteenth Amendments to the Constitution of the United States of America in that the black, Mexican-American, and white residents of the northern and eastern sections of Amarillo, Texas are denied a meaningful participation in the right of suffrage because of the at-large method used in electing the mayor and members of the City Commission of Amarillo, Texas. Plaintiffs complain that the at-large system of electing the city's mayor and commissioners has prevented any black or Mexican-American from ever holding an office as mayor or commissioner and that the large majority of the mayors and members of the City Commission have been elected from the southwest portion of the city known as the "target area" as outlined in red on Plaintiffs' Exhibit 7–A. The plaintiffs pray that an injunction issue against the defendants requiring that elections to the City Commission be conducted on a single-member district basis and for attorney's fees. The defendants are the mayor,. members of the City Commission, and city manager of the City of Amarillo, Texas. Some of these named defendants no longer serve in their official capacities but their successors in office are defendants. No relief is sought against the defendants in their individual capacities.

This action is brought pursuant to 42 U.S.C. § 1983, and this court has jurisdiction under 28 U.S.C. § 1343. The plaintiffs have not asked for monetary damages other than the recovery of attorney's fees.

Amarillo is a municipal corporation, known as a "home-rule" city, organized pursuant to the provisions of Tex.Rev. Civ.Stat.Ann. arts. 1165–1182 (1963). The charter of the City of Amarillo was adopted in the year 1913 and Amarillo was one of the first, if not the first, city in Texas to adopt such a charter. At the time of its adoption, the charter provided that the four members of the City Commission and mayor would be elected by the qualified voters of that city vot-

ing at an at-large election and at the same time provided that the members of the Commission would be elected by place—Places 1 through 4 on the ballot. At the time of the adoption of this charter and of this system of election of its governing body, the black population of Amarillo was approximately 1% and the Mexican-American population was probably even less at such time.

Amarillo was termed by the expert witness for the plaintiffs as a "reform city." By that definition, a "reform city" is that type of city government that was developed around the turn of the century and had three principal characteristics: (1) at-large elections of members of the City Commission; (2) a city manager-council or commission organization; and (3) non-partisan elections.

Based on the 1970 census Amarillo has a population of approximately 127,000 and of these 5.2% are black and 6.6% are Mexican-American. There were 61,070 persons qualified to vote in the 1975 city election. Of the eligible voting population, 4.5% are black and 5.3% are Mexican-American. For the purpose of city elections in Amarillo, there is one election district, which consists of that area within the city limits of the City of Amarillo. A candidate, to attain public office in Amarillo, must receive a majority of the votes cast in the first election. In the event that he does not, a runoff election is held. There is no provision in the city's charter for the candidates to run from a particular geographic district. The charter provides that it can be amended by a majority vote of the qualified voters of the city, voting in an election called for that purpose. An election to amend the Charter of the City of Amarillo may be called by a two-thirds vote of the City Commission or must be called by presentation to the Commission of a petition seeking such election, signed by 5 percent (previously 10%) of the qualified voters of the City of Amarillo. No petition signed by the required percentage of the qualified voters of the City of Amarillo, seeking to amend the charter and provide for election of members of the City Commission from districts within the city has been presented to the City Commission.

The Supreme Court of the United States and the Fifth Circuit have articulated a set of legal standards by which the constitutionality of an election system is to be gauged. It is clear that multi-member districts are not *per se* unconstitutional. *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). The plaintiffs must show the court that the system has the effect of invidiously canceling out or minimizing their voting strength. To sustain their burden, plaintiffs must prove to the satisfaction of the court that the at-large system here in question prevents them from enjoying full access to the processes of nomination and election. To show only that the group in question has not had elected officials in proportion to its voting power is insufficient. *White v. Regester, supra; Whitcomb v. Chavis, supra.* With these guidelines as a framework, the United States Court of Appeals for the Fifth Circuit has set out factors which, when viewed collectively in light of the existing circumstances, may support a finding of dilution of a group's voting strength. The factors to consider are (1) the opportunity for participation in the candidate selection process, (2) the responsiveness of elected officials to the particular concerns of the group, (3) the continuing effects of past discrimination on a group's ability to participate in the political process, and (4) the policy underlying the preference for multi-member or at-large voting. *Wallace v. House,* 515 F.2d 619 (5th Cir. 1975); *Bradas v. Rapides Parish Police Jury,* 508 F.2d 1109 (5th Cir. 1975); *Turner v. McKeithen,* 490 F.2d 191 (5th Cir. 1973); *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973).

Although these dilution factors warrant primary consideration, the court must look to any structural devices that could enhance whatever dilution potential may be found. *Wallace v. House, supra; Bradas v. Rapides Parish Police Jury, supra; Turner v. McKeithen, supra.*

This court must examine the evidence presented by plaintiffs and determine whether they have been denied meaningful participation in the City Commission elections in Amarillo in light of the four basic dilution factors, together with any enhancement factors. Every factor need not be proved in order to obtain relief; rather they should be viewed in the aggregate. *Wallace v. House, supra.*

 (1) Access to the Candidate Selection Process in Amarillo City Commission Elections

■ The Fifth Circuit recognizes that access to the political process and not population is the "barometer of dilution" of minority voting strength. *Bradas, supra,* 508 F.2d at 1112; *Turner, supra,* 490 F.2d at 193–194; *Zimmer, supra,* 485 F.2d at 1303.

The City of Amarillo, like many metropolitan cities, has an association or organization that is formed by various interested citizens to endorse a slate of candidates for city office just prior to each city election. This has been done in Amarillo since 1971 through the Amarillo Citizens Association, or ACA; and although, not 100% successful, by and large the slate endorsed by the ACA has been successfully elected in Amarillo and the evidence indicates that a great majority of such endorsed slate resides in the southwest or "target area" of the city. It is noted, however, that at the present time, at least one city commissioner, Jerry Hodge, has run against an ACA-endorsed candidate and has been elected.

The operation of the ACA in Amarillo has one feature that the witnesses indicated was absent from similar candidate slating groups in other metropolitan cities. The ACA, some two to three months prior to each city election, holds a "town hall" meeting in each of the nine junior high school buildings of the city. Defendants' Exhibit 1 is a map showing the location of these town hall meetings and it appears that each part of the city has a location for such meetings. These meetings are given advance publicity and all residents served by these junior high schools are invited and urged to attend these meetings for the purpose of electing two delegates to the governing board of the ACA. Each citizen, including those of minority groups, is given the right to come to such meeting and to elect delegates and vote his preference. Prior to each election since the creation of the ACA, both blacks and Mexican-Americans have been elected to serve on the governing board. Percentage-wise, the representation on this committee by blacks and Mexican-Americans has been at least equal to, if not greater than, the city's overall racial minority population. These elected members later select three at-large members to complete the board. This board, or steering committee, interviews prospective candidates whose names have been previously suggested at the town-hall meetings which also elected the governing board. After completing the interviews, the board picks its slate of candidates. Salvador Martinez, a Mexican-American candidate for city commission in 1973, did not receive ACA endorsement, but he is now serving as vice president of the ACA.

The problem of campaign financing might weigh in favor of a determination that there is a denial of access to or participation in the election process. One of plaintiffs' contentions is that at-large elections discriminate against certain citizens on the basis of wealth in that a city-wide campaign is expensive and potential candidates from lower income areas are inhibited from entering a race against a well financed opponent or else are defeated because they are outspent in the campaign. It is a fact in Amaril-

lo, as elsewhere, that the availability of money is a strong factor in making a successful political race for city office. It is also a fact that the campaign money for the city races in Amarillo comes from the southwest area of the city and the evidence indicates that it largely finances the ACA endorsed candidates. The members of the minorities who have run for city office have not been the recipients of these political donations, nor has any minority candidate ever received ACA endorsement with the exception of Mr. Rael. However, there is no evidence that the city itself participates in these political donations and it is quite evident to the court that even under a single-member district plan, the persons who have contributed money in the past will in all probability continue to contribute in the future to the candidates of their own political persuasion in their own districts as well as in other districts. The plaintiffs attempted to show that the creation of single-member districts would reduce the cost of campaigning. Their theory is that since the geographic area of a single district and the number of voters therein would be smaller, then necessarily the costs of campaigning would likewise be reduced. While this theory does seem logically sound, there was testimony by defendants' expert, as well as one of plaintiffs' witnesses, that campaign costs could actually be higher in a single-member district, if a highly competitive campaign developed. The testimony was that single-member districts do tend to foster greater competition, and the court does not find that single-member districts in Amarillo would substantially lessen the costs of campaigning as compared with an at-large election.

This court is satisfied from a review of the evidence that plaintiffs have failed to prove that the candidate slating process in Amarillo is not open to participation by every segment of the population. In fact, the only formal body, the ACA, appears to be more open than its counterparts in most other cities.

There is no filing fee required of prospective candidates in city elections, and the court finds that there is no denial of the right of any minority or socio-economic group to become a candidate for city office or to otherwise participate in the candidate selection process.

(2) Responsiveness of the City Commission to the Interests of all Citizens of Amarillo

The plaintiffs have failed to put forth sufficient evidence to prove a lack of responsiveness of Amarillo's elected officials to minority interests. The court was presented with several indicators of responsiveness, or lack thereof. In the area of employment of minorities by the city, the percentage of minority employees is roughly proportionate to their percentage of the population, but the higher paying jobs are still held primarily by whites. Moreover, the city has been delinquent in placing minorities in the police and fire departments, but the evidence and testimony shows that the city is now taking some action to remedy this situation. It appears to the satisfaction of the court that the city has been responsive to minority interests in its appointments to boards and commissions. There is dispute as to the relative importance of some of these boards, but overall, the city has allowed adequate input by minorities into the decision making process by these appointments. The evidence further showed that the city has been even-handed in its capital expenditures and expenditures from revenue sharing funds. In fact, it was shown that the western part of the city has received less of these expenditures, despite its having most of the elected representatives and its paying greater property taxes.

The testimony of plaintiffs' own witnesses has demonstrated that the city commission has been responsive to the desires of citizens of east Amarillo. The access to the commission has been through organized "pressure groups" such as the NAACP, Concerned Citizens

Association, and Potter-Randall County Citizens Association. For example, the city had wished to locate a sanitary landfill in some part of the city. On three occasions, the city changed the location of the landfill after such pressure groups had voiced their objections.

There was evidence that the city commission has taken measures to make needed street paving improvements in eastern parts of the city. Additionally, in response to citizen demands, the commission corrected dangerous conditions around a lake which had resulted in the drownings of several Amarillo children.

Based on the testimony of defendants' expert witness, the court finds that responsiveness of, and access to, Amarillo's city government for racial minorities might possibly be decreased by the implementation of single-member districts. In fact, this expert witness at first refused to testify for and to cooperate with defendants because of his strong belief in single-member districts, but after examining the facts, he concluded that single-member districts in Amarillo could actually dilute the voting strength of blacks and Mexican-Americans.

■ Due to the relatively small percentage of minority population in Amarillo, there would have to be at least 14 or more single-member districts in order to give the blacks and Mexican-Americans a percentage majority in one district for each ethnic minority, with the remaining 12 districts being predominantly all white majorities. It would be possible to carve out two of these "safe" districts because the black and Mexican-American groups each have their separate identifiable areas of residence where the percentage in those areas would be more than 50%. The creation of 14 single-member districts plus a mayor for a city of 127,000 is not feasible and the court does not find that even two minority representatives on a fourteen-member commission would give the minorities any more participation than they now

have, and possibly not as much. By dividing the city into 4 or 5 single-member districts, the impact of the black and Mexican-American voting in at least 2 of these single-member districts would be increased. Where they have a 4.5% and 5.3% strength of the voting population over the city as a whole, division into 4 districts would in the most favorable redistricting give the blacks 19.8% of the vote in what is termed the northeast district and the Mexican-Americans 18.3% of the vote in what is termed the southeast district. This would be increased to a higher percentage if there were 5 districts but nowhere approaching a majority in any district.

Further, the defendants' expert testified that in some cities, where there is a single district with a substantial racial minority, but less than a majority, the election can more easily take on racist overtones. Consequently, the other district representatives would have no direct obligation to the minority citizens of other districts. Quite possibly the "minority" district, with a lower socioeconomic white majority, might elect what Dr. Taebel termed as an "Archie Bunker" commissioner, one with a political philosophy adverse to minority interests. So instead of having some degree of access to all commissioners, there could possibly be a polarization of Anglos against the minorites and these minority groups might be effectively shut out altogether from access to a representative.

Naturally, legal and fiscal restrictions prevent total responsiveness to all needs of all citizens, but the evidence put forward by plaintiffs cannot support a finding that the Amarillo City Commission has failed to meet its responsibility to its minority and lower socio-economic constituents to such an extent that this would be considered a dilution factor of significant importance as was the case in *Wallace v. House, supra;* and *Perry v. City of Opelousas,* 515 F.2d 639 (5th Cir. 1975).

(3) Debilitating Effects of Past Discrimination on Participation in the Political Process

█ The evidence is conclusive and all parties agree that there is no restriction at the present time upon the right of any member of a minority race to vote so long as he is a qualified voter. There is no restriction making it difficult for such member of a minority race to register to vote, there is no filing fee for running for office in the city elections, and all persons register to vote at the same location.

The City Commission of Amarillo, Texas appoints many boards and commissions to advise and consult with the City Commission on various aspects of municipal government such as the Airport Zoning Board, Library Board, Human Development Board, and many and various other similarly appointed boards. There is a dispute in the evidence as to the importance of these boards, but the evidence did establish as a fact that at the present time 6.3% of the members of all of the boards and commissions in Amarillo, Texas are blacks and a like 6.3% are Mexican-Americans. This is roughly equal to their minority percentages as to total population and greater than their numerical percentage of eligible voting population. The court finds that this particular aspect of municipal government is one in which the minorities have a meaningful right of participation and do meaningfully participate as evidenced by the above figures.

█ Except for the large turn-outs and voting along racial lines by the black members of the community for several black candidates in previous elections, the evidence has been insufficient to convince the court that the citizens of Amarillo as a whole have voted along racial lines such as was present in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973); *Turner v. McKeithen*, 490 F.2d 191 (5th Cir. 1973); or *Wallace v. House*, 515 F.2d 619 (5th Cir. 1975).

Undoubtedly, there has been in the past some racial discrimination in Amarillo. This included a lack of full access to the right to vote, and the right to register to vote, but the court finds that at the present time, and for the past ten years or more, there have been no continuing debilitating effects of such discrimination that would inhibit or deny the right to any member of a minority race or a socio-economic group to fully participate in the city's political processes. The evidence shows that citizens from every ethnic and socio-economic group do have an opportunity to participate meaningfully in every stage of the city electoral process.

(4) Policy Underlying At-Large Election

The at-large system of election has existed in Amarillo since 1913, this system being an integral part of the reform movement which emerged around the turn of the century, according to the expert witnesses for plaintiffs and defendants.

Plaintiffs' expert witness testified that there were many characteristics of such reform cities that are bad and in particular that the at-large election of members of the commission resulted in an almost uniform denial of the rights of minorities to participate meaningfully in the city's political processes. This witness concluded that because Amarillo was a reform city in that it had the three requirements above noted it necessarily followed that it has the bad characteristics, one of these being the denial of minorities' rights to participate politically. However the facts do not bear out this conclusion in Amarillo.

█ When Amarillo began to use this system, blacks constituted approximately 1% of the city's population. It is not known what percentage of Amarillo's citizens were Mexican-Americans in 1913. The plaintiffs have failed to present enough evidence to the court to support a finding that any such at-large system was racially motivated in its origin; rather it appears that this longstanding policy had nothing to do with any such racially motivated objectives.

Indeed, the present situation stands in contrast to *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973), in which a long-standing policy of single-member district voting was changed to an at-large system, clearly in response to increased black voting strength in the 1960's.

In summary, the plaintiffs here have failed to demonstrate the unconstitutionality of the city commission election system for the City of Amarillo. Under the standard of *White v. Regester, supra,* they have failed to show that this system operates to invidiously cancel out or minimize either their voting strength or their ability to participate fully in the political process. Moreover, the plaintiffs have not shown the existence of any of the four "dilution" factors heretofore utilized by this circuit to support a finding of unconstitutionality. The structural voting devices, or "enhancement factors, that the city has are a place system, a majority vote requirement, and a lack of residency requirement in a particular geographic district for at-large candidates. These factors may show a potential for dilution, but standing alone, as they do here, they cannot support a finding of unconstitutionality. The white, black, and Mexican-American citizens of east Amarillo feel that elected representatives who reside in the southwest, or "target area" of the city do not represent them fully. However, the Supreme Court of the United States has repeatedly said that a determination such as plaintiffs here request must be based on facts, and not upon a theoretical presumption that an elected official will not represent the electorate which chooses him. *Dallas County, Alabama v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975); *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967); *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). The decision in this case cannot be based upon what the plaintiffs, or the court, may feel is a preferable system, but rather the deci-

sion must turn on the evidence offered by plaintiffs which can demonstrate unconstitutionality by established standards. The plaintiffs here have not put forth sufficient evidence for such a determination.

 Even though the court might be mistaken in the findings and conclusions above that there has been no denial of due process or equal protection of the laws to members of the minority or socio-economic groups in Amarillo, there is one other ground that dictates judgment for the defendants. As noted above, the plaintiffs sue only as individuals, not as members of a class, and the evidence is wholly devoid of any facts that would show that any one of the five named plaintiffs have themselves as individuals ever been denied any equal protection of the laws or the due processes of law. Although all of the plaintiffs were in the courtroom, only one testified and that was strictly to rebut evidence given by one of the defendants' witnesses, and no mention was made of any instance where he himself had been denied any access to any of the political system and the municipal election processes. The total lack of evidence that would support the individual plaintiffs' claims in this case is sufficient within itself to deny relief. However the court has taken the broadest view possible: that the individual-plaintiffs are members of either a minority race or some particular socio-economic group, (although the evidence failed to identify such socio-economic groups as to which any plaintiff might have belonged), and by the fact that they belonged to such minority or group, the denial of due process or equal protection to such minority group is itself sufficient to show the individual's denial of equal protection or due process. For that reason, the court concludes that judgment should be given for the defendants on the basis of the merits of this suit as shown by the evidence rather than on the ground that the plaintiffs failed to prove their own individual facts to show

their denial of due process or equal protection.

The court will, therefore, enter a judgment in accordance with the above denying the plaintiffs all of the relief sought.