No. 68,089

*In re* Petition of Robert T. Stephan, Attorney General, To Determine the Validity of 1992 House Bill No. 3083.

(836 P.2d 574)

Opinion filed July 10, 1992.

(For original opinion filed June 4, 1992, see 251 Kan. 595, 833 P.2d 1017.)

*Per Curiam*: This is an original action commenced by Robert T. Stephan, the attorney general of the State of Kansas, to determine the validity of House Bill No. 3083, enacted during the 1992 session of the Kansas Legislature. The bill reapportions the state representative and senatorial districts and repeals the statutes that formerly established such districts. On June 4, 1992, we announced our decision in this case in accordance with the mandate of Article 10, § 1 of the Kansas Constitution that this court enter judgment concerning the validity of the reapportionment legislation within 30 days of the filing of the attorney general's petition. We held that the legislation was valid and stated a formal opinion setting forth the views of this court would follow. See *In Re House Bill No. 3083*, 251 Kan. 595, 833 P.2d 1017 (1992). For the reasons stated in this opinion, we find House Bill No. 3083 valid legislation.

This action is brought pursuant to Article 10, § 1 of the Kansas Constitution, which provides:

"**Reapportionment of senatorial and representative districts.** (a) At its regular session in 1989, the legislature shall by law reapportion the state representative districts, the state senatorial districts or both the state representative and senatorial districts upon the basis of the latest census of the inhabitants of the state taken by authority of chapter 61 of the 1987 Session

Laws of Kansas. At its regular session in 1992, and at its regular session every tenth year thereafter, the legislature shall by law reapportion the state senatorial districts and representative districts on the basis of the population of the state as established by the most recent census of population taken and published by the United States bureau of the census. Senatorial and representative districts shall be reapportioned upon the basis of the population of the state adjusted: (1) To exclude nonresident military personnel stationed within the state and nonresident students attending colleges and universities within the state; and (2) to include military personnel stationed within the state who are residents of the state and students attending colleges and universities within the state who are residents of the state in the district of their permanent residence. Bills reapportioning legislative districts shall be published in the Kansas register immediately upon final passage and shall be effective for the next following election of legislators and thereafter until again reapportioned.

"(b) Within 15 days after the publication of an act reapportioning the legislative districts within the time specified in (a), the attorney general shall petition the supreme court of the state to determine the validity thereof. The supreme court, within 30 days from the filing of the petition, shall enter its judgment. Should the supreme court determine that the reapportionment statute is invalid, the legislature shall enact a statute of reapportionment conforming to the judgment of the supreme court within 15 days.

"(c) Upon enactment of a reapportionment to conform with a judgment under (b), the attorney general shall apply to the supreme court of the state to determine the validity thereof. The supreme court, within 10 days from the filing of such application, shall enter its judgment. Should the supreme court determine that the reapportionment statute is invalid, the legislature shall again enact a statute reapportioning the legislative districts in compliance with the direction of and conforming to the mandate of the supreme court within 15 days after entry thereof.

"(d) Whenever a petition or application is filed under this section, the supreme court, in accordance with its rules, shall permit interested persons to present their views.

"(e) A judgment of the supreme court of the state determining a reapportionment to be valid shall be final until the legislative districts are again reapportioned in accordance herewith."

The petition of the attorney general to determine the validity of House Bill No. 3083 was filed with the clerk of this court on May 15, 1992. We entered an order the same day scheduling a hearing on the petition for Thursday, May 28, 1992. The hearing concerning representative districts (sections 1 through 128 of the bill) was scheduled to commence at 9:00 a.m., and the hearing concerning senatorial districts (sections 129 through 171 of the bill) was scheduled to commence at 1:30 p.m. To provide wide

public notice of that hearing, we directed the clerk of this court to publish a copy of the scheduling order one time in each of 13 newspapers of wide circulation: The Topeka Capital-Journal, The Kansas City Kansan, The Kansas City Star, The Wichita Eagle, The Emporia Gazette, The Salina Journal, The Hutchinson News, The Pittsburg Morning Sun, The Garden City Telegram, The Junction City Daily Union, The Manhattan Mercury, The Lawrence Journal-World, and The Johnson County Sun. Interested persons were invited to file written statements in support of or in opposition to the proposed reapportionment before noon on Wednesday, May 27, 1992, and were invited to make oral presentations. Interested persons submitting written statements were not required to present their views orally to the court.

The May 15 petition of the attorney general to determine the validity of the reapportionment legislation took no stance on the validity of the House or Senate reapportionment, praying only for a public hearing and for this court to determine the validity of the legislation.

Robert A. Coldsnow, assistant revisor, Office of the Revisor of Statutes, Topeka, Kansas, filed written statements in support of the reapportionment legislation on behalf of the Senate, the House of Representatives, and the Kansas Legislative Coordinating Council.

David G. Miller, President of the Eudora Chamber of Commerce, and James V. Hoover, Mayor of Eudora, filed a joint statement on behalf of Eudora, Kansas, opposing the House reapportionment plan.

David G. Miller of Eudora, Kansas, in his individual capacity; Maurice L. Taylor, Mayor of the City of Edgerton, Kansas; and the McCamish Township Board, Gardner, Kansas, filed written statements opposing the Senate reapportionment plan. Carol Lehman, Mayor of the City of Gardner, Kansas, sent a written statement opposing the Senate reapportionment plan by facsimile machine on May 28, 1992. The clerk of this court received Mayor Lehman's statement at 11:45 a.m. that morning. The statement was available to the court before the 1:30 p.m. hearing on Senate reapportionment. We acknowledged receipt of the statement at the hearing. Mayor Lehman's statement was considered with the other statements in arriving at a decision in this proceeding.

Robert T. Stephan, attorney general, and Robert A. Coldsnow, assistant revisor, made oral presentations to the court. Both urged this court to approve the reapportionment legislation.

The attorney general provided maps of the House and Senate districts for the entire state and individual maps of the House and Senate districts for Johnson, Sedgwick, Shawnee, and Wyandotte Counties. The maps were admitted by the court and made a part of the record.

John R. Wine, Jr., general counsel, and Brad Bryant, census director, both from the Office of the Secretary of State, responded to questions about the census adjustment procedure.

David G. Miller, Eudora, Kansas, made an oral presentation in opposition to the House reapportionment plan.

There was no oral presentation opposing the Senate reapportionment legislation. At the conclusion of the hearing on Senate reapportionment, the Chief Justice inquired whether anyone present desired to address the court regarding the Senate reapportionment legislation. No one indicated a desire to do so.

Upon consideration of the matter, we examined the petition with its exhibits, the written statements and briefs received from the persons noted above, and the maps of the representative and senatorial districts provided by the attorney general. We also took judicial notice of other relevant official records.

Article 10, § 1(b) of the Kansas Constitution requires this court to determine the validity of reapportionment legislation. "In determining whether a reapportionment act is valid, a court must examine both the procedure by which the act became law and the substance of the apportionment act to determine that it satisfies constitutional requirements." *In re Substitute for House Bill No. 2492*, 245 Kan. 118, Syl. ¶ 1, 775 P.2d 663 (1989); see *In re Senate Bill No. 220*, 225 Kan. 628, Syl. ¶ 2, 593 P.2d 1 (1979).

## Procedural validity of the legislation

The procedure by which the reapportionment legislation was enacted is challenged. The complaint is that there was no opportunity for public comment on the drawing of district lines. The complaint is essentially the same for both the House and Senate districts.

David G. Miller and James V. Hoover, in their joint statement filed on behalf of the City of Eudora, allege there was no opportunity for public participation in the drawing of the House districts. They maintain that the public hearings conducted in July 1991 were not meaningful because complete census figures were not available until after the hearings. They assert that any subsequent hearing also was not meaningful because, at that point in time, the bill had not been printed and was not public. Additionally, Miller and Hoover allege there was a "deal" between leadership in the House and Senate for the Senate not to change the proposed representative districts drawn by the House.

Miller, in his individual capacity, objects that there was no opportunity for public participation in the drawing of the Senate districts. Relying on numerous press accounts, he suggests that secret behind-the-scene negotiations caused the Senate's late action on the bill and resulted in a "deal" being amended into the bill on the Senate floor. He objects to the House of Representatives accepting the Senate amendments without the customary conference committee being appointed. Miller's final complaint is that there was virtually no opportunity for public knowledge of the plan because of the speed at which this legislative action proceeded.

House Bill No. 3083 was introduced into the House on February 20, 1992. On February 21, 1992, the bill was referred to the House Committee of the Whole, which recommended that the bill be passed. On that same day, the bill was advanced to final action and passed on final action by a vote of 100 yeas to 25 nays. On February 24, 1992, the bill was received and introduced into the Senate. The following day, the bill was referred to the Committee on Legislative and Congressional Apportionment. On April 3, 1992, the bill was withdrawn from that committee and referred to the Senate Committee on Ways and Means. It was withdrawn from Ways and Means the next day and re-referred to the Committee on Legislative and Congressional Apportionment. On April 10, 1992, the Committee on Legislative and Congressional Apportionment recommended that the bill be passed as amended by that committee. On May 6, 1992, the bill was advanced to final action, subject to amendment and debate. The committee amendments were adopted and the

bill was further amended by the full Senate. It then was passed as amended by a vote of 27 yeas to 13 nays. On the same day, the House of Representatives concurred in the Senate amendments by a vote of 92 yeas to 33 nays. The bill was enrolled and presented to the Governor on May 7, 1992, and the Governor signed the bill on May 8, 1992. The bill became effective upon its publication in the Kansas Register on May 14, 1992.

There is no contention or evidence that the applicable legislative rules and constitutional and statutory law concerning the enactment of legislation were not followed or were in some way violated. The details of the legislative process relative to this bill, as set out in the journals of the Senate and the House of Representatives and previously summarized, indicate no flaws in the procedure by which the bill became law. The procedure appears to comport with all constitutional requirements. Further, there is no evidence that legislative meetings or action were conducted in secret. The fact the legislative process relative to reapportionment moved with dispatch during the waning hours of the 1992 legislative session after three months of alleged inertia is insufficient to invalidate the legislative enactment if no procedural deficiency exists. Although a greater opportunity for comment on the proposed Senate districts could have been provided the public as a matter of good government, the failure to do so under the existing circumstances is not a deficiency that invalidates this enactment on procedural grounds. Accordingly, we find House Bill No. 3083 valid procedurally.

### Substantive validity of the legislation

Our review of House Bill No. 3083 now focuses upon the substantive validity of the reapportionment legislation for the representative and senatorial districts. Our substantive review of the reapportionment legislation addresses the following: Does House Bill No. 3083 violate the "one person-one vote" principle? Do the reapportioned House and Senate districts impermissibly split political entities and communities of interest? Does the reapportionment legislation violate section 2 of the federal Voting Rights Act, 42 U.S.C. § 1973 (1988)?

Before discussing the "one person-one vote" principle, we also must consider the federal census and the state adjustments to it.

As noted above, Article 10, § 1 of the Kansas Constitution provides:

"[T]he legislature shall by law reapportion the state senatorial districts and representative districts on the basis of the population of the state as established by the most recent census of population taken and published by the United States bureau of the census. Senatorial and representative districts shall be reapportioned upon the basis of the population of the state adjusted: (1) to exclude nonresident military personnel stationed within the state and nonresident students attending colleges and universities within the state; and (2) to include military personnel stationed within the state who are residents of the state and students attending colleges and universities within the state who are residents of the state in the district of their permanent residence."

"A court may generally rely upon either a state or federal census. The information contained in them is presumed to be accurate and is prima facie correct until proven otherwise." *In re Substitute for House Bill No. 2492*, 245 Kan. at 123. For purposes of this proceeding, we presume the accuracy of the census figures underlying the reapportionment legislation.

"One person-one vote" challenges to state legislative redistricting schemes are based upon the Fourteenth Amendment's guarantee of equal protection. In the context of reapportionment, equal protection requires one person's vote to be worth as much as another person's vote to the extent district population apportionment will permit. *In re Senate Bill No. 220*, 225 Kan. 628, Syl. ¶ 4; see *Reynolds v. Sims*, 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964).

Sections 4 through 128 of House Bill No. 3083 divide the state into 125 single-member state representative districts and allocate the state's population to the various districts. An ideal representative district would contain 19,563 persons. This figure is calculated by dividing the state's adjusted population total of 2,445,380 by 125 districts. Districts created by House Bill No. 3083 range from a low of 18,600 persons in House District 39 to a high of 20,502 in House District 65. House District 39, which consists of parts of Johnson, Leavenworth, and Wyandotte Counties, has 963 fewer persons than the ideal population and is 4.92 percent below the ideal population. House District 65, which consists of most of Geary County, has 939 more persons than the ideal district and is approximately 4.80 percent above

the ideal population. Disregarding the rounding associated with these two percentages, the relative overall range, *i.e.*, the sum of the greatest percentage above and below the ideal, is 9.72 percent. None of the districts contains exactly 19,563 persons.

Sections 132 through 171 of the bill divide the state into 40 single-member state senatorial districts and allocate the state's population to the various districts. An ideal senatorial district would contain 61,135 persons. This figure is calculated by dividing the state's adjusted population total by 40. Districts created by the bill range in size from a low of 58,649 persons in Senate District 37 to a high of 62,864 persons in Senate District 19. Senate District 37, which consists of Lane, Ness, Hodgeman, Rooks, Ellis, Rush, Pawnee, Edwards, and Kiowa Counties, has 2,486 fewer persons than the ideal district and is approximately 4.07 percent below the ideal population. Senate District 19, which consists of parts of Shawnee, Osage, and Douglas Counties, has 1,729 more persons than the ideal district and is approximately 2.83 percent above the ideal. Disregarding the rounding associated with these two percentages, the relative overall range is slightly greater than 6.89 percent. None of the districts contains exactly 61,135 persons.

Written objections to the state senatorial districts include claims that deviations from the ideal population are too high, that low population districts in the western part of the state have resulted in several oversized districts in other parts of the state, and that deviations in population are too high to justify the splitting of several counties into more than one district.

"A fair and reasonable apportionment of the legislative districts of the whole state must be formulated primarily by the legislative process with all of its political trappings and necessary compromises. That districts could have been drawn with smaller percentage deviations from the ideal than were actually drawn during the legislative process, thus establishing deviations nearer the ideal, will not invalidate an apportionment plan that is constitutionally sound." *In re Senate Bill No. 220*, 225 Kan. at 634.

In *White v. Regester*, 412 U.S. 755, 37 L. Ed. 2d 314, 93 S. Ct. 2332 (1973), and *Gaffney v. Cummings*, 412 U.S. 735, 37 L. Ed. 2d 298, 93 S. Ct. 2321 (1973), the United States Supreme Court held that minor population deviations do not establish a

prima facie constitutional violation. The deviations in those cases were 9.9 percent and 7.83 percent respectively.

Discussing permissible population deviation in *In re House Bill No. 2620*, 225 Kan. 827, 832, 595 P.2d 334 (1979), we said that "[a] 5% deviation over and a 5% deviation under the ideal district population appears to be the line drawn by the federal courts. If the total maximum variation is over 10%, proper justification for such a variation appears to be necessary." Here, the overall deviation for the representative districts is 9.72 percent and the overall deviation for the senatorial districts is 6.89 percent. Both are within the guidelines established by this court and, therefore, need no justification.

Miller and Hoover argue that a near 10 percent total deviation in population for the House districts is too high. They contend the allowable deviation should be considerably lower because of the technology now available, such as computer assisted map-making. They also point out federal congressional districts are not allowed as high a total deviation and question the differing standards for state and federal reapportionment. Miller and Hoover urge this court to establish a stricter standard for the allowable percentage of deviation in state reapportionment than is required by the United States Supreme Court. This, we decline to do. Notwithstanding plus and minus percentages, 32 percent of the House districts are within 2 percent of the ideal population and 54.4 percent are within 3 percent of the ideal population.

Under the circumstances disclosed herein, we conclude the reapportionment plan for the House and Senate does not violate the "one person-one vote" principle guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

### Splitting of political entities and communities of interest

Another criterion for considering the validity of the reapportionment legislation is whether the reapportioned districts are compact and contiguous or split political entities and communities of interest.

Miller and Hoover, who submitted a written statement on behalf of the City of Eudora, contend House District 47 is not compact and contiguous. They state it is not possible to get from

Eudora to Jefferson County without either swimming or leaving the district.

House District 47 encompasses most of Jefferson County and includes the northeastern corner of Douglas County. Eudora is located in the northeastern corner of Douglas County. This northeastern corner of Douglas County will be referred to as the Eudora area. The Eudora area is adjacent to Johnson County on the east and to Leavenworth and Jefferson Counties on the north. Douglas County borders the southern and western sides of the Eudora area. The boundary between the Eudora area and Jefferson County is the shortest of any of the boundary lines mentioned.

House District 47 does lack a certain compactness or contiguity. We have acknowledged that "lack of contiguity or compactness raises immediate questions as to political gerrymandering and possible invidious discrimination which should be satisfactorily explained by some rational state policy or justification." *In re House Bill No. 2620*, 225 Kan. at 834.

Miller and Hoover suggest there has been gerrymandering to protect incumbent representatives. As one of its guidelines, the House Committee on Legislative, Judicial, and Congressional Apportionment asserted that districts should not be drawn to protect or to defeat an incumbent representative. The Committee explained the 1992 reapportionment plan does not affect the vast majority of incumbents because there have been only minor shifts in population since the 1989 reapportionment.

Another one of the Committee's guidelines was that districts should be as compact as possible and contiguous. The Committee "took into account the availability and facility of transportation and communication between the people in a proposed district." The Committee also acknowledged there would be limitations:

"Compactness is limited by variances caused by the shape of counties, VTD's (i.e. precinct and township lines), natural boundaries, population density and the need to retain compactness of adjacent districts. The compactness of each House district must be related also to the overall approach used in developing districts of population as equal as practical."

Miller and Hoover also object to the House reapportionment plan because the plan splits political entities, such as Douglas County. The mere fact that a political entity, such as a county,

is split does not vitiate the act. See *In re Substitute for House Bill No. 2492*, 245 Kan. at 127. Miller and Hoover do not suggest Douglas County was divided because of any improper motive. No evidence has been offered that would indicate the size and shape of House District 47 was engineered to cancel out the voting strength of any cognizable group or locale. There are no claims of discrimination. Further, the Committee noted that the 1992 House reapportionment is an improvement over the 1989 reapportionment in that only 48 counties were divided in 1992, whereas the 1989 reapportionment divided 50 counties.

Miller and Hoover also claim that Eudora's community of interest is not with Jefferson County, but is linked to Douglas and Johnson Counties by the K-10 corridor. In support, Miller and Hoover state that a recent survey indicated 90 percent of Eudora's residents work in Eudora, elsewhere in Douglas County, or in Johnson County.

In determining communities of interest, the Committee noted that interests common to a population area were considered to ensure that all citizens receive reasonable, fair, and effective representation. Specifically enumerated were those interests

"common to an urban area, a rural area, an industrial area or an agricultural area and those common to areas where people share similar living standards, racial and ethnic concerns, use the same transportation facilities, share school districts, have similar work opportunities, or have access to the same media of communication relevant to the election process."

The Committee recognized, as does this court, that

"innumerable districts ideal for particular communities can be constructed if each is considered in isolation; but, when the entire state is divided into a specified number of districts, that which may appear ideal for one place or another must be subordinated to the goal of fair and reasonable apportionment of the whole state."

Miller and Hoover's objections to proposed House District 47 do not invalidate House Bill No. 3083. Although we might have drawn House district lines differently, we cannot substitute our judgment for that of the legislature.

For the most part, the senatorial districts established in the reapportionment plan respect the integrity of existing political subdivisions of the state—the county boundary lines. The division of Montgomery, Haskell, Barton, Geary, Marion, Coffey, Osage,

and Dickinson Counties is questioned; however, no explanation is given for the objection. Additionally, no argument is made that the split is the result of partisan gerrymandering or that it results in discrimination. In fact, the persons objecting state the split of these counties might be justified if the deviation in population was low. Although the objecting persons conclude the deviation is too high, we previously have addressed the deviation issue and held that the deviations were permissible. Therefore, we conclude there is no basis to hold the split of these particular counties invalidates the reapportionment of the state Senate.

Other objections to the senatorial districts are that the City of Edgerton and McCamish Township are not in the same district as the cities of Gardner and Spring Hill, that the City of Olathe and southwest Johnson County both have been split between two Senate districts, and that both Unified School District No. 231 and Johnson County Fire District No. 1 are divided between two senatorial districts. As with the representative districts, there is no suggestion or evidence that the senatorial divisions were designed to dilute or cancel out the voting strength of persons in any cognizable group or locale or that the challenged divisions have the effect of discriminating.

It is well settled that the state constitution is not a grant of power but a limitation upon power. Unless legislation duly passed is contrary to some express or implied prohibition contained in the constitution, the courts have no authority to pronounce it invalid. *NEA-Fort Scott v. U.S.D. No. 234*, 225 Kan. 607, 608-09, 592 P.2d 463 (1979). Hence, this court, in accordance with the separation of powers doctrine, will not substitute its judgment for that of another equal branch of the government, but will only measure acts with the yardstick of the constitution. The propriety and wisdom of legislation are exclusively matters for legislative determination. In the absence of a constitutional violation, this court is not at liberty to declare the reapportionment plan void because it allegedly creates inconvenience, is unfair, or is inequitable.

The fact that other plans could be devised that might avoid dividing certain communities and political entities into two or more districts does not, by itself, give us cause to reject the plan adopted by the legislature.

### Federal Voting Rights Act, Section 2

Although there has been no objection, suggestion, or claim that House Bill No. 3083 dilutes minority representation, our final consideration concerns section 2 of the federal Voting Rights Act, 42 U.S.C. § 1973 (1988). In general, minority representation may not be diluted by fracturing, packing, or other methods of gerrymandering of political boundaries.

One of the guidelines the legislature used in reapportioning the House and the Senate was that redistricting would have neither the purpose nor the effect of diluting minority voting strength. A state cannot assume a plan within the 10 percent overall deviation is safe from a successful challenge if it has discriminated against minorities. Section 2 of the federal Voting Rights Act, 42 U.S.C. § 1973, provides:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in [42 U.S.C. § 1973b(f)(2)(1988)] of this title, as provided in subsection (b) of this section.

"(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

In a lawsuit alleging a violation of section 2 of the Voting Rights Act, the test is whether "as a result of a challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Thornburg v. Gingles,* 478 U.S. 30, 44, 92 L. Ed. 2d 25, 106 S. Ct. 2752 (1986). Courts that have considered the matter apparently are split in determining whether the total minority population should be considered in ascertaining if a minority group can constitute an effective single-member district. Compare *League of United Latin v. Midland Ind. Sch. Dist.,* 648 F. Supp.

596, 605-06 (W.D. Tex. 1986) (court did not differentiate between minority population and eligible voting age minority population), with *Romero v. City of Pomona,* 665 F. Supp. 853, 857 (C.D. Cal. 1987) (court relied upon eligible voting age minority population). Here, the difference in the percentages between the minority population and the eligible voting age minority population is not significant.

In terms of House districts, Wyandotte and Sedgwick Counties merit special attention because of the size of the minority population and the geographical compactness of the area. The House Committee on Legislative, Judicial, and Congressional Apportionment specifically discussed these two counties:

"The two districts in Wyandotte County of African-American majorities located in the Northeast part of Kansas City, Kansas, were redrawn to distribute more evenly the African-American population. District 34 has a total 70.15% African-American population and a voting age African-American population of 67.27%. District 35 has a total 67.17% African-American population and a voting age African-American population of 63.07%. District 36 which adjoins Districts 34 and 35 to the West has a total 32.63% African-American population and a voting age African-American population of 28.99%. District 37 which lies to the South of District 34 has a total 15.96% African-American population and a voting age population of 14.00% District 36 has an African-American population sufficient to possibly influence an election.

"In Sedgwick County the North-central part of Wichita the present African-American district (District 89) was retained and has a total 55.16% African-American population and a voting age African-American population of 49.96%. District 84 which adjoins District 89 on the South was redrawn to have a total 54.04% African-American population and a voting age African-American population of 50.59%. Because of population gains in Wichita another district was added. It is District 103, which adjoins Districts 89 and 84 to the West, and has a total 15.30% African-American population and a voting age African-American population of 13.55%. District 103 also has a total of 20.98% population of Hispanic origin with a voting age population of Hispanic origin of 16.65%. The remaining population of Hispanic origin in Wichita is fairly well distributed throughout the city and does not represent any appreciable percent of the population of a district as it does in District 103 where it has been possible to retain intact the most significant concentration of persons of Hispanic origin in Wichita."

With regard to Senate districts, only Wyandotte and Sedgwick Counties have minorities of sufficient numerical strength and geographical compactness to warrant consideration. The record be-

fore this court indicates Senate District 4 in Wyandotte County and Senate District 29 in Sedgwick County have been drawn to create districts in which minorities are concentrated to provide a better chance for the election of minorities.

We find no evidence that the legislature has engaged in unacceptable techniques such as gerrymandering of district boundaries, fracturing, or packing minority districts in redrawing the House and Senate districts. Therefore, the reapportionment plan does not violate Section 2 of the Voting Rights Act.

We conclude that the reapportionment legislation does not violate the Constitutions of the United States or of the State of Kansas. Judgment is entered upholding the validity of 1992 House Bill 3083.