No. 88,735

PETITION OF CARLA J. STOVALL, ATTORNEY GENERAL, TO DETERMINE THE VALIDITY OF 2002 SUBSTITUTE FOR HOUSE BILL 2625.

(44 P.3d 1266)

Opinion filed April 26, 2002.

*Carla J. Stovall*, attorney general, argued the cause, and *William Scott Hesse*, assistant attorney general, and *John W. Campbell*, senior deputy attorney general were with her on the brief for petitioner.

The opinion of the court was delivered by

ABBOTT, J.: This action is brought by the Attorney General of the State of Kansas pursuant to article 10, § 1 of the Kansas Constitution, which provides for reapportionment of senatorial and representative districts.

On April 5, 2002, the attorney general filed a petition with the clerk of the court to determine the validity of 2002 Substitute for House Bill 2625. The bill had passed the Kansas House of Representatives by a 105 to 16 margin. The exact plan was subsequently passed unchanged by the Kansas Senate on March 7, 2002, by a

39 to 1 margin. Governor Bill Graves signed the bill on March 11, 2002. When the attorney general filed her pleadings in this court to determine the validity of the bill, the court immediately entered an order scheduling a hearing on the petition for Wednesday afternoon, April 17, 2002. To provide wide public notice of the hearing, the court directed the clerk of the court to publish a copy of the scheduling order one time in each of 13 newspapers of wide circulation: The Topeka Capital-Journal, The Kansas City Kansan, The Kansas City Star, The Wichita Eagle, The Emporia Gazette, The Salina Journal, The Hutchinson News, The Pittsburg Morning Sun, The Garden City Telegram, The Junction City Daily Union, The Manhattan Mercury, The Lawrence Journal-World, and The Arkansas City Traveler. A copy of the scheduling order also appeared in the Kansas Register and was posted on the Supreme Court's website at www.kscourts.org. Interested persons were invited to file written statements in support of or in opposition to the proposed reapportionment before noon on Tuesday, April 16, 2002, and those submitting written statements were invited to make oral presentations. Interested persons submitting written statements were not required to present their views orally to the court. No written statements were filed.

The attorney general appeared in person and argued the case. She recommended to the court that it approve the reapportionment legislation.

The attorney general provided maps of the House districts for the entire state and individual maps of the House districts for numerous counties, including Sedgwick, Shawnee, and Wyandotte Counties. The maps were admitted by the court and made a part of the record.

Upon consideration of the matter, the court examined the petition filed by the attorney general, along with its exhibits, and the written statement and the brief filed by the attorney general. The court also examined the maps of the representative districts provided by the attorney and took judicial notice of other relevant official records.

Despite the lack of objection, the court is required by article 10, § 1(b) of the Kansas Constitution to examine the legislation and

determine the validity of the reapportionment legislation. " 'In determining whether a reapportionment act is valid, a court must examine both the procedure by which the act became law and the substance of the apportionment act to determine that it satisfies constitutional requirements.' " *In re House Bill No. 3083*, 251 Kan. 597, 601, 836 P.2d 574 (1992) (quoting *In re Substitute for House Bill No. 2492*, 245 Kan. 118, Syl. ¶ 1, 775 P.2d 663 [1989]).

Some general rules of law for examining reapportionment legislation which the court used as guidelines follow.

Beginning with *Baker v. Carr*, 369 U.S. 186, 237, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962), where the United States Supreme Court held the principle of one person-one vote applies to state legislative as well as congressional districts, the high court has decided numerous reapportionment cases. In *Reynolds v. Sims*, 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964), the United States Supreme Court noted that both houses of a bicameral legislature must be apportioned on a population basis, finding that the Equal Protection Clause of the Fourteenth Amendment requires a state to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." 377 U.S. at 577. However, the Court noted that mathematical exactness is not a "workable" requirement, stating that "the machinery of government would not work if it were not allowed a little play in its joints." 377 U.S. at 577 n.57 (quoting *Bain Peanut Co. v. Pinson*, 282 U.S. 499, 501, 75 L. Ed. 2d 482, 51 S. Ct. 228 [1930]).

In *White v. Regester*, 412 U.S. 755, 763, 37 L. Ed. 2d 314, 93 S. Ct. 2332 (1973), the United States Supreme Court held that a population deviation with an overall range of 9.9% (5.8% overrepresentation to 4.1% under representation) between Texas legislative districts did not prove a prima facie case of discrimination in violation of the Equal Protection Clause. This court followed that rule in *In re House Bill No. 3083*, 251 Kan. at 606, acknowledging a permissible total deviation of 10% from an "ideal" district, as stated in *Regester* when reapportioning the 1992 Kansas House and Senate districts. Relatively minor population deviation in legislative districts was held not to dilute the weight of one's vote such

that one is denied fair and effective representation. *Regester*, 412 U.S. at 764. Following *Mahan v. Howell*, 410 U.S. 315, 35 L. Ed. 2d 320, 93 S. Ct. 979 (1973), and *Gaffney v. Cummings*, 412 U.S. 735, 37 L. Ed. 2d 298, 93 S. Ct. 2321 (1973), the United States Supreme Court noted that state legislative reapportionment statutes are not subject to the stricter standards of reapportionment of congressional districts. *Regester*, 412 U.S. at 763. From *Regester* and its progeny, the 9.9% overall range or total variation from the number of people in an ideal district remains the United States Supreme Court's limit before a prima facie violation of the Equal Protection Clause has been shown, requiring justification based on a rational state policy.

The United States Supreme Court has identified a number of legislative policies which, if consistently applied, might justify a deviation from an ideal district population. Those policies include: "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Karcher v. Daggett*, 462 U.S. 725, 740, 77 L. Ed. 2d 133, 103 S. Ct. 2653 (1983); see *Bush v. Vera*, 517 U.S. 952, 977, 135 L. Ed. 2d 248, 116 S. Ct. 1941 (1996).

While article 10 of the Kansas Constitution requires this court to determine the validity of the reapportionment act, the constitution does not define "valid," nor does it specify any criteria for determining the validity of a reapportionment act. Kan. Const. art. 10. This court has previously noted that the reapportionment act must be valid as to the procedure in which it became law and as to the substance of the apportionment itself to meet the constitutional requirements. *In re House Bill No. 3083*, 251 Kan. at 601; *In re Senate Bill No. 220*, 225 Kan. 628, 632, 593 P.2d 1 (1979).

If an apportionment plan is constitutionally sound, it is immaterial that districts could have been drawn with smaller percentage deviations, and this court will not invalidate it. A political gerrymandering challenge was dismissed by this court because there had not been a showing of an equal protection violation. *In re House Bill No. 3083*, 251 Kan. at 607-09.

The one person-one vote principle originates from the guarantees of the Equal Protection Clause of the Fourteenth Amendment

to the United States Constitution. The substantive doctrine of one person—one vote means that, as nearly as practicable, one person's vote is to be worth as much as another person's vote.

The United States Supreme Court has issued numerous opinions with regard to reapportionment since 1992. These cases have mainly dealt with the 1982 amendments to the Voting Rights Act. Section 2 of the Voting Rights Act prohibits any "standard, practice or procedure," including redistricting plans, that result in discrimination against minority voters. 42 U.S.C. § 1973 (1994). These cases have balanced the competing issues of whether state and local governments must create a "majority-minority" representative district or whether state and local governments must simply provide minority voters with an effective chance to elect candidates of their choice. A majority-minority district is a district where the members of a particular minority group have over 50% of the population in a specific representative district.

Section 2 of the Voting Rights Act focuses on equal political opportunity and political effectiveness. *Johnson v. De Grandy*, 512 U.S. 997, 1014, 129 L. Ed. 2d 775, 114 S. Ct. 2647 (1994). The purpose of 42 U.S.C. § 1973 is to create minority opportunity districts, not maximization of minority voting strength. States may not dilute a minority group's voting strength by dividing such a group among numerous representative districts. On the other hand, a state may not dilute a minority group's strength by "packing" as many members of such a group into one district as possible and, thus, diluting the minority group's bloc voting strength in adjacent districts. "In general, minority representation may not be diluted by fracturing, packing, or other methods of gerrymandering of political boundaries." *In re House Bill No. 3083*, 251 Kan. at 610.

Courts are to review the "totality of the circumstances" in determining whether a minority group has the opportunity to participate in the political process. *De Grandy*, 512 U.S. at 1024. In determining the totality of the circumstances, it is important to determine the proportionality between the number of minority controlled districts and the minority's share of the state's relevant population. 512 U.S. at 1020. In determining the totality of the circumstances in establishing a district, the state must keep in mind

that the Equal Protection Clause of the Fourteenth Amendment prohibits the excessive and unjustified use of race in redistricting. *Shaw v. Reno*, 509 U.S. 603, 632, 125 L. Ed. 2d 511, 113 S. Ct. 2816 (1993). "Race must not simply have been 'a motivation for the drawing of a majority-minority district' . . . but 'the *"predominant* factor" motivating the legislature's districting decision' " in order to show improper use of race as a criterion. *Easley v. Cromartie*, 532 U.S. 234, 241, 149 L. Ed. 2d 430, 121 S. Ct. 1452 (2001). In other words, race may be a motivating factor in drawing a particular representative district. However, race may not be the predominant factor in drawing that same representative district. 532 U.S. at 241.

In *Growe v. Emison*, 507 U.S. 25, 122 L. Ed. 2d 388, 113 S. Ct. 1075 (1993), the United States Supreme Court applied the 1982 amendments to § 2 of the Voting Rights Act to determine when a "minority-majority" district must be created. In creating a "minority-majority" district the three prerequisites articulated in *Thornburg v. Gingles*, 478 U.S. 30, 92 L. Ed. 2d 25, 106 S. Ct. 2752 (1986), are applicable: first, "that [the minority group] is sufficiently large and geographically compact to constitute a majority in a single member district"; second, "that it is politically cohesive"; and third, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51; *Emison*, 507 U.S. at 40. "Unless these points are established, there neither has been a wrong nor can be a remedy." 507 U.S. at 40-41.

This court accurately predicted the trends in reapportionment law when it followed *Gingles* in determining the validity of the 1992 Kansas legislative districts. "[T]he test is whether, 'as a result of a challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.' " *In re House Bill No. 3083*, 251 Kan. at 610.

In applying § 2 of the Voting Rights Act, the state must be wary of the "Shaw Doctrine," first articulated in *Shaw v. Reno*, 509 U.S. 603, which held the Equal Protection Clause of the Fourteenth Amendment prohibits the excessive and unjustified use of race in

redistricting. The Shaw Doctrine requires a court to determine, then balance, the extent to which the state considered race on one side and how much it considered "traditional race-neutral districting principles" on the other. See *Vera*, 517 U.S. at 958. When the traditional race-neutral districting principles outweigh the race-based factors, the newly drawn district is presumed to be constitutional. When the race-based factors outweigh the traditional race-neutral districting principles, the district is considered to be an unlawful racially gerrymandered district.

Other traditional race-neutral districting principles include respect for political subdivisions. When a state divides cities, townships, counties, school districts, towns, and other recognized political entities among several representative districts, the appearance of a "racial gerrymander" is clear unless the state can point to some compelling reason, other than race, why the districts were drawn in the manner in which they were.

The shared community interests may not simply be based on race itself but include shared broadcast and print media, public transport infrastructure, and institutions such as schools and churches. *Vera*, 517 U.S. at 964.

Another legitimate political goal is safely retaining seats for the political parties. See *Cromartie*, 532 U.S. at 239 (stating that the creation of a safe Democratic seat was a constitutionally valid political objective).

The guidelines establish precincts (VTDs) as the "building blocks" to be used for drawing district boundaries based on official 2000 United States Census maps. Districts are to be compact and contiguous. 251 Kan. at 606-07. Integrity of existing political subdivisions is to be preserved where practicable. See *Miller v. Johnson*, 515 U.S. 900, 906, 182 L. Ed. 2d 762, 115 S. Ct. 2475 (1995); *Shaw*, 509 U.S. at 646; *Vera*, 517 U.S. at 977; *Moon v. Meadows*, 952 F. Supp. 1141, 1148 (E.D. Va.), *aff'd* 521 U.S. 1113 (1997).

Similarities of interest, including social, cultural, racial, ethnic, and economic interests common to the population of the area, are to be considered. Redistricting plans are not to have the purpose or the effect of diluting minority voting strength.

The procedure by which the reapportionment legislation was enacted has not been challenged. There is no evidence that legislative meetings or actions were conducted in secret. In the absence of evidence of violation of constitutional or statutory law, or any evidence that the applicable legislative rules were not followed, we do not find any procedural inadequacies.

Next, our review of Substitute for H.B. 2625 takes up the substantive validity of the legislation on representative districts. The bill divides the state into 125 single-member state representative districts. The ideal representative district would consist of 21,378 persons. The ideal figure can be obtained by dividing the state adjusted population figure of 2,672,257 by 125.

The largest district is District 10 located in Douglas and Franklin Counties with a population of 22,447 (or +5%) while the smallest district is District 3 located in Crawford County with a population of 20,320 (or -4.95%). Applying the 2000 census figures as adjusted to the current districts reveals an overall deviation of 9.95%, a range that is constitutional. Because the House plan's deviation of 9.95% is less than the 10% standard discussed above, it is presumed valid for Fourteenth and Fifteenth Amendment purposes.

Only four "new" districts that are not represented by current members of the Kansas House of Representatives were added. These districts are the 38th District in Douglas and Johnson Counties; the 48th and 49th Districts in Johnson County; and the 105th District in Sedgwick County.

Conversely, only eight current members of the House of Representatives are in districts containing other sitting members of that body. These eight sitting members of the House of Representatives are in four districts. Two districts, the 35th and the 116th, potentially pit incumbent members of the Democratic Party against each other in a primary election. Two other districts, the 62nd and 110th, potentially pit an incumbent from the Republican and Democratic Parties against each other in the general election.

Districts meriting special attention appear in Wyandotte and Sedgwick Counties. The two districts in Wyandotte County of African-American majorities located in the northeast part of Kansas City, Kansas, were drawn to more evenly benefit the African-Amer-

ican population. District 34 has a total 67.8% African-American population and District 35 has a total 59.7% African-American population. District 37 which lies south of District 34 has a total African-American population of 21.6%. Clearly there are two African-American majority districts and an additional district with sufficient African-American population to influence an election.

The reapportionment plan retains District 89 in Sedgwick County, represented by an African-American female in north-central Wichita. In 1992, District 89 was a majority-minority district. Under the current redistricting plan, District 89 has a total 49.1% African-American population. District 84, which adjoins District 89 on the south, was retained with a total 55.2% African-American population. District 84 is represented by an African-American. District 103 has been retained and is the district where the most significant concentration of the Hispanic population (38.1%) is located. The remaining Hispanic population in Wichita is fairly well distributed through the city and does not represent any appreciable percentage of the population of any district other than the 103rd District. An example of the distribution of Hispanic voters throughout Wichita is expressed by the fact that a Hispanic male represents House District 100. Clearly, there is one majority African-American district that is currently represented by an African-American. In addition, there is one district strongly influenced by Hispanics in Sedgwick County and another majority district which is represented by a Hispanic person.

We further note that a member of the Native American Osage Nation represents House District 67 in central Kansas. Additionally, an African-American female represents House District 44 in Lawrence. Both of those House members represent white majority districts.

None of the Kansas legislative districts created in Substitute H.B. 2625 appear to violate the one person-one vote principle. No challenge has been raised, and minority representatives of these districts were consulted and participated in drawing the lines for these districts.

Our review of the substantive validity of the reapportionment legislation includes a determination of whether the districts are

compact and contiguous as drawn. "[L]ack of contiguity or com-pactness raises immediate questions as to political gerrymandering and possible invidious discrimination which should be satisfactorily explained by some rational state policy or justification." *In re House Bill No. 2620*, 225 Kan. at 834. However, "[t]he mere fact that a political entity, such as a county, is split does not vitiate the act." *In re House Bill No. 3083*, 251 Kan. at 607-08.

After examining the maps of the districts provided, we conclude that no violations exist that would require a satisfactory explanation.

Substitute H.B. 2625 draws new boundaries for the 125 House seats. The bill passed the legislature with fairly strong bipartisan support, and it has been signed by the Governor. Legislation is presumed to be constitutional.

Under the circumstances disclosed herein, we conclude the re-apportionment plan for the House does not violate the one person-one vote principle guaranteed by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Judgment is entered upholding the validity of 2002 Substitute for H.B. 2625.