IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,083

In the Matter of the Petition of DEREK SCHMIDT, Attorney General,
to Determine the Validity of
Substitute for Senate Bill 563.

SYLLABUS BY THE COURT

In this original action brought by the Attorney General of Kansas to determine the validity of the Legislature's reapportionment of state senatorial and representative districts, it is held the legislative enactment is valid.

Original action. Decision announced May 18, 2022. Opinion filed June 21, 2022. Validity of Substitute for Senate Bill 563, reapportioning state senatorial and representative districts, is upheld.

*Derek Schmidt*, attorney general, argued the cause, and *Jeffrey A. Chanay*, chief deputy attorney general, *Brant M. Laue*, solicitor general, *Dwight R. Carswell*, deputy solicitor general, *Shannon Grammel*, deputy solicitor general, and *Kurtis K. Wiard*, assistant solicitor general, were with him on the petition and briefs for petitioner.

*Mark P. Johnson*, of Dentons US LLP, of Kansas City, Missouri, argued the cause, and *Stephen R. McAllister*, of the same firm, was with him on the brief for intervenor Senator Thomas Holland.

The opinion of the court was delivered by

STEGALL, J.: For the first time in 20 years our court, as required by the Kansas Constitution, is called on to review state reapportionment legislation for compliance with state and federal law. Article 10, section 1 imposes on us a duty to review the Kansas State House and Kansas State Senate reapportionment maps contained within Substitute

1

for Senate Bill 563 (Sub. SB 563) to ensure the district lines are "valid." We hold those maps contain no constitutional errors.

FACTUAL AND PROCEDURAL BACKGROUND

Kansas has 40 senatorial districts and 125 representative districts. Kan. Const. art. 2, § 2; K.S.A. 4-101. Last year, the Kansas Legislature began the process of preparing to redraw those districts according to the 2020 Census. Through in-person and virtual meetings, the House and Senate Committees on Redistricting held a listening tour of 18 town hall meetings across the state. All meetings were live-streamed, and the public was invited to submit written and/or oral testimony.

Also playing a role in the process is the document known as "the Guidelines." The Proposed Guidelines and Criteria for 2022 Kansas Congressional and State Legislative Redistricting are a set of principles that set forth "traditional redistricting criteria" substantively the same as those used in the 2012 redistricting cycle. The Guidelines provide calculations for the correct population metrics to determine district size, as well as general priorities for the Legislature to consider.

The Senate Committee on Ways and Means introduced SB 563 on March 14, 2022, which contained proposed maps for both the Senate and House of Representatives. After it was introduced, the bill was referred by the Senate Vice President (under the authority of the Senate President) to the Senate Committee on Redistricting. The report of the Senate Committee on Redistricting recommended that Sub. SB 563 be adopted as amended. On March 16, the Senate Committee of the Whole adopted the report of the Senate Committee on Redistricting and then proceeded to debate Sub. SB 563. Further proposed amendments to Sub. SB 563 were all rejected. Sub. SB 563 was considered on

final action on March 17. The Senate passed Sub. SB 563 by a vote of 28 to 8 (23 Republicans and 5 Democrats voting in favor; 4 Democrats and 4 Republicans opposed).

The House of Representatives then received Sub. SB 563 from the Senate. Sub. SB 563 was referred to the Committee of the Whole on March 21, 2022. The Committee of the Whole amended Sub. SB 563 to switch to the House's preferred map for representative districts. Sub. SB 563 was then advanced to final action. On March 23, the House passed Sub. SB 563 as amended by a vote of 112 to 9 (78 Republicans and 34 Democrats voting in favor; 6 Republicans and 3 Democrats opposed).

Thus, the two maps at issue here—colloquially known as the Kansas State Senate map "Liberty 3" and the Kansas State House map "Free State 3F"—were approved by bipartisan majorities.

On March 28, 2022, the Senate nonconcurred in the House's amendments and requested a Conference Committee be appointed. The House acceded. The President of the Senate and Speaker of the House appointed their respective chamber's members of the Conference Committee. The Conference Committee issued its report on March 30, and that same day, the Senate adopted the Conference Committee report by a vote of 29 to 11 (25 Republicans and 4 Democrats voting in favor; 4 Republicans and 7 Democrats opposed). The House adopted it by a vote of 83 to 40 (80 Republicans and 3 Democrats voting in favor; 36 Democrats and 4 Republicans opposed). The legislative record reveals that some of the votes changed between the first vote described above to the March 30 vote due to the Conference Committee's addition to Sub. SB 563 of the State Board of Education Map (which is not at issue in this matter).

Sub. SB 563 was then enrolled and presented to Governor Laura Kelly on April 8, 2022. Governor Kelly signed Sub. SB 563 into law on April 15, and the Secretary of State published Sub. SB 563 in the Kansas Register on April 21.

On April 25, Attorney General Derek Schmidt petitioned our court to determine the validity of Sub. SB 563, as required by Article 10, section 1(b). The petition initiates a unique original action in the Kansas Supreme Court. This one-of-a-kind action is "not technically an adversary proceeding" even though there may be persons in opposition to the apportionment. *In re Senate Bill No. 220*, 225 Kan. 628, 629-30, 593 P.2d 1 (1979). Once the petition was filed, we entered a scheduling order permitting interested persons to present their view by submitting a written statement, as required by Kansas Constitution article 10, section 1(d). The scheduling order also provided directions for any person wishing to file a motion to intervene or file an amicus brief.

This court received one motion to intervene from Senator Thomas Holland, a Democrat from Baldwin City, who has served Senate District 3 since 2009. As a result of the redrawn boundaries in Sub. SB 563, Senator Holland now lives in District 9, where incumbent Republican Senator Beverly Gossage currently serves. Senator Holland contests the procedure by which Sub. SB 563 was enacted and the new boundaries of Districts 3 and 9.

DISCUSSION

Article 10, section 1 of the Kansas Constitution provides:

"(a) At its regular session in 1992, and at its regular session every tenth year thereafter, the legislature shall by law reapportion the state senatorial districts and representative districts on the basis of the population of the state as established by the

4

most recent census of population taken and published by the United States census bureau.

. . .

"(b) Within 15 days after the publication of an act reapportioning the legislative districts within the time specified in (a), the attorney general shall petition the supreme court of the state to determine the validity thereof. The supreme court, within 30 days from the filing of the petition, shall enter its judgment. Should the supreme court determine that the reapportionment statute is invalid, the legislature shall enact a statute of reapportionment conforming to the judgment of the supreme court within 15 days.

"(c) Upon enactment of a reapportionment to conform with a judgment under (b), the attorney general shall apply to the supreme court of the state to determine the validity thereof. The supreme court, within 10 days from the filing of such application, shall enter its judgment. Should the supreme court determine that the reapportionment statute is invalid, the legislature shall again enact a statute reapportioning the legislative districts in compliance with the direction of and conforming to the mandate of the supreme court within 15 days after entry thereof.

"(d) Whenever a petition or application is filed under this section, the supreme court, in accordance with its rules, shall permit interested persons to present their views."

To determine whether a reapportionment act is "valid" under Article 10, section 1(b), we "examine both the procedure by which the act became law and the substance of the apportionment act to determine that it satisfies constitutional requirements." *In re House Bill No. 3083*, 251 Kan. 597, 601, 836 P.2d 574 (1992) (quoting *In re Substitute for House Bill No. 2492*, 245 Kan. 118, Syl. ¶ 1, 775 P.2d 663 [1989]). We evaluate the act for substantive compliance under both the federal and state Constitutions. To do this, we (1) ensure the act comports with the "one person one vote" standard; and (2) ensure the act does not invidiously discriminate.

We also consider the legislation's validity under the federal Voting Rights Act (VRA)—even if no objection has been raised on that ground—because Article 10 directs us to determine the Act's "validity," which we have said does not limit our automatic review to only constitutional issues. *In re House Bill No. 3083*, 251 Kan. at 610. The VRA protects against certain kinds of minority vote dilution in a redistricting plan. Just because a plan satisfies the one person one vote standard, we will not assume it "is safe from a successful challenge if it has discriminated against minorities." 251 Kan. at 610.

In the past, we have indicated that invidious discrimination may include discrimination based on political party. See *In re House Bill No. 2620*, 225 Kan. 827, Syl. ¶ 4, 595 P.2d 334 (1979) ("Substantially equal districts may be invidiously discriminatory because they were organized in such a way as to minimize or cancel out the voting strength of racial or political elements of the voting population."). So the reader may legitimately wonder whether claims of political gerrymandering in state maps are justiciable under Article 10, section 1, after our decision today in *Rivera v. Schwab*, 315 Kan. ___ (No. 125,092, this day decided), slip op. at 35-36 (holding that such claims are nonjusticiable in the context of a congressional map). But we expressly decline to reach that question here as it is not necessary to the outcome since there are no colorable claims of political gerrymandering and a review of the record reveals no significant evidence of line drawing motivated by political gain. See *In re House Bill No. 3083*, 251 Kan. 597, 836 P.2d 574 (1992).

*Sub. SB 563 is procedurally valid*

Intervenor Senator Holland's arguments focus largely on the procedure by which Sub. SB 563 was adopted. Senator Holland criticizes how the listening tour was conducted, the speed with which Sub. SB 563 was adopted, the lack of Democratic

6

participation in drafting the Senate map before it was introduced, and the fact that the Legislature did not closely follow the Guidelines.

In past cases, when evaluating the procedure by which the reapportionment legislation was passed, we have considered whether applicable legislative rules and constitutional and statutory law concerning the enactment of legislation were followed. If the legislation was tainted by procedural flaws that would not comport with all constitutional requirements for lawmaking, or if there was evidence that formal legislative meetings or action were conducted in secret, there could be a procedural problem. *In re House Bill No. 3083*, 251 Kan. at 603; *2002 Substitute for House Bill 2625*, 273 Kan. at 723. Senator Holland points to these statements in our caselaw and argues by extension that the different, process-related grounds he cites likewise render Sub. SB 563 invalid. We disagree.

The only procedural irregularities or defects that could, standing alone, provide an independent basis for invalidating a reapportionment scheme are the requirements set forth in the Kansas Constitution concerning the enactment of legislation—i.e., the provisions that dictate how a bill must be passed by both houses of the Legislature and signed by the Governor. *In re House Bill No. 3083*, 251 Kan. at 602-03; *In re House Bill No. 2620*, 225 Kan. 827, 841, 595 P.2d 334 (1979); *Harris v. Shanahan*, 192 Kan. 183, 191, 200, 387 P.2d 771 (1963). The Attorney General, in his petition, has set forth a step-by-step analysis of the procedure which Sub. SB 563 followed in arriving on the Governor's desk. The procedural steps need not be repeated here. We have examined them and conclude all necessary procedural steps were taken. The Act was properly approved in public meetings by both the House and Senate, and it was signed into law by Governor Kelly.

7

We will not invalidate reapportionment legislation solely because of allegations that the Legislature has not adhered to the Guidelines. We take no issue with claims that the Guidelines contain good redistricting policies (though we decline to affirmatively describe the Guidelines with appellations such as "good government" or "best practices" because courts are ill-suited to make the kinds of policy pronouncements contained in the Guidelines). But even accepting at face value the idea that the Guidelines should have been followed, a failure to do so cannot as a matter of law render the subsequent legislation procedurally invalid. Situations may arise where legislative policies create competing interests which the Legislature must balance. See, e.g., *Essex v. Kobach*, 874 F. Supp. 2d 1069, 1083, 1091 (D. Kan. 2012) (expressing "reluctan[ce]" to rely very heavily on the Legislature's adopted guidelines, instead relying on federal constitutional guidance and only "considering to a much lesser degree the state's legislative policies guiding redistricting"); *Bolz v. State Farm Mut. Ins. Co.*, 274 Kan. 420, 424, 52 P.3d 898 (2002) ("Where the legislature declares the public policy and there is no constitutional impediment, the question of the wisdom, justice, or expediency of the legislation is for the legislature and not for the courts."); *Hunt v. Eddy*, 150 Kan. 1, 4, 90 P.2d 747 (1939) ("No principle of law is more firmly established in our system of jurisprudence than the principle that the lawmakers possess the sole authority to determine what legislative policies will advance the public interest. Such policies present questions of statecraft and are determined by the legislative branch of government, and not by the courts. Courts are concerned only with the [constitutional] validity of the enactment. [Citations omitted.]").

Thus, our consideration of validity is grounded in the following inquiry—does the redistricting legislation comport with procedural requirements for lawmaking and substantive constitutional and statutory requirements? A failure by the Legislature to follow its own guidelines may, in certain limited circumstances, be a leading indicator that there could be a procedural or substantive problem with the legislation. But Senator Holland does not advance this argument. Rather, he suggests the alleged irregularities and

8

departures from the Guidelines provide an independent basis to challenge the maps. Therefore, the alleged defects raised by Senator Holland do not call into question the constitutional validity of the procedure by which Sub. SB 563 became law. We find that Sub. SB 563 is procedurally valid.

*Sub. SB 563 is substantively valid*

The Equal Protection Clause of the Fourteenth Amendment "requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964); see also *In re Senate Bill 220*, 225 Kan. at 633 (describing the equal protection underpinnings of reapportionment and remarking that "[t]his doctrine has been popularized as 'one person-one vote'"). Yet absolute mathematical precision "is hardly a workable constitutional requirement," as it is "a practical impossibility to arrange legislative districts so that each one has an identical number of residents." *Reynolds*, 377 U.S. at 577.

Given this, the United States Supreme Court has held that state redistricting plans with a relative overall range of less than 10%—plus or minus 5% from the "ideal" population—are presumed valid. *Evenwel v. Abbott*, 578 U.S. 54, 60, 136 S. Ct. 1120, 194 L. Ed. 2d 291 (2016); *In re House Bill No. 3083*, 251 Kan. at 606. The "ideal district" population is calculated by dividing the total population of the state by the number of legislative districts drawn by the reapportionment act. *In re Senate Bill 220*, 225 Kan. at 634. Plans that have population deviations over 10% may still be valid, but they "must be justified by a rational state policy." 225 Kan. at 634. The fact that the map could have been drawn with a lower deviation from the ideal population is irrelevant to our inquiry. *In re 2002 Substitute for Senate Bill 256*, 273 Kan. 731, 733, 45 P.3d 855 (2002).

Based on new census data, Kansas' total population is 2,937,880. This makes 73,447 the ideal population for the Senate districts. The largest deviation in any of Liberty 3's 40 Senate districts is District 5, which is 3.95% above the ideal population. The smallest Senate district is District 3, which is 3.4% below the ideal population. This means that Liberty 3 has a total deviation of 7.35%—well within the range to pass constitutional muster. See 273 Kan. at 734 (approving a deviation of 9.27%).

The ideal population for the House districts is 23,503. In Free State 3F, the largest deviation in any of the 125 House districts is District 44, which is 3.59% above the ideal population. The smallest House district is District 112, which has a population deviation of 3.94% below the ideal population. This means that the Free State 3F map has a total population deviation of 7.53%. This too is lower than the population deviations of prior House maps upheld by this court. See *2002 Substitute for House Bill 2625*, 273 Kan. at 723 (approving a deviation of 9.95%). Both maps satisfy the one person-one vote principle.

We next examine the House and Senate maps for invidious discrimination and hold there are no credible allegations the state legislative maps were intentionally drawn to assign citizens to certain districts based on race or any other protected class. See *In re House Bill No. 3083*, 251 Kan. 597. And after reviewing the population breakdown in districts with significant minority populations in connection with the VRA inquiry below, we conclude the Legislature did not impermissibly "excessive[ly] or unjustifi[ably] use . . . race in redistricting." *2002 Substitute for House Bill 2625*, 273 Kan. at 720-21 (citing *Shaw v. Reno*, 509 U.S. 630, 632, 113 S. Ct. 2816, 125 L. Ed. 2d 511 [1993]).

Senator Holland gestures toward a vague discriminatory intent in the legislative enactment by arguing that Sub. SB 563 is invalid because it violates section 4(a) of the Guidelines—which directs "Districts should be as compact as possible and contiguous"—

10

since District 3 and District 9 are not as "compact . . . and contiguous" as possible. Senator Holland similarly argues that the Legislature failed to follow section 4(b) of the Guidelines by dividing District 9, which previously was contained within a single county, into four counties, and dividing District 3, which previously was contained in two counties, into four counties. Senator Holland alleges this was intentionally done to pit him as a Democratic senator against an incumbent Republican senator.

However, Senator Holland does not allege any facts sufficient to raise a constitutional concern relating to discrimination. Put another way, even if we assume as true everything Senator Holland alleges about Districts 3 and 9 and the legislative intent behind them, we still could not conclude the districts are invalid forms of discrimination. While section 4(b) of the Guidelines does state that "[t]he integrity and priority of existing political subdivisions should be preserved to the extent possible," our caselaw has tempered this language in the past. "The mere fact that a political entity, such as a county, is split does not vitiate the act." *In re House Bill No. 3083*, 251 Kan. at 607-08 (citing *In re Substitute for House Bill No. 2492*, 245 Kan. at 127). Moreover, even though "'[r]edistricting may pit incumbents against one another or make very difficult the election of the most experienced legislator[, t]he reality is that districting inevitably has and *is intended to have substantial political consequences*.'" (Emphasis added.) *In re 2002 Substitute for Senate Bill 256*, 273 Kan. at 734 (quoting *Gaffney v. Cummings*, 412 U.S. 735, 753, 93 S. Ct. 2321, 37 L. Ed. 2d 298 [1973]).

Sub. SB 563 pits two sets of senatorial incumbents against each other:  Senators Holland and Gossage in District 9, and Republican Senators Michael Fagg and Rick Wilborn in District 14. In the House, there are three sets of incumbent contests, all between Republican incumbents:  Representatives Ron Ryckman and Megan Lynn in District 49; Representatives Steven Johnson and Clarke Sanders in District 69; and

11

Representatives Jim Minnix and Tatum Lee in District 118. Sub. SB 563 is not invalid on this ground that it pits too many incumbents against one another.

Finally, we conduct an analysis of the maps for compliance with the federal VRA. In 1965, Congress invoked the power conferred by § 2 of the Fifteenth Amendment and enacted the VRA to accomplish "what the Fifteenth Amendment had sought to bring about 95 years earlier:  an end to the denial of the right to vote based on race." *Brnovich v. Democratic National Committee*, 594 U.S. ___, 141 S. Ct. 2321, 2330-31, 210 L. Ed. 2d 753 (2021).

The Voting Rights Act, 52 U.S.C. § 10301 (2018) (formerly 42 U.S.C. § 1973) provides:

> "(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

> "(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:  *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

The purpose of the VRA is to create minority opportunity districts, but it does not require maximization of minority voting strength. Rather, in certain defined circumstances it prohibits dilution of the minority vote by (1) "cracking" the group

12

among numerous districts, and (2) "packing" as many members of a minority group into one district as possible. *2002 Substitute for House Bill 2625*, 273 Kan. at 720.

In this instance, we need not make a deep dive into the VRA to declare the maps valid. This is because the numbers recited below demonstrate clearly and absolutely that no "cracking" or "packing" has occurred. We have historically held that districts in Wyandotte and Sedgwick Counties merit special attention because minority populations in some of those districts may be large enough to trigger VRA protections.

Senate District 4 in Wyandotte County has been retained and is currently represented by a Black senator. In 2012, District 4 had a voting age Black population of 33.6%. In 2022, District 4 has a Black population of 34.1%. Senate District 4 also has a significant Hispanic population. In 2012, the voting age Hispanic population was 29.8%. In 2022, the Hispanic population in District 4 is 29.2%. Minority populations were not diluted in District 4.

Senate District 25 in Sedgwick County has been retained. This district has a significant Hispanic population. In 2012, the Hispanic population in District 25 was 21%. In 2022 District 25 has a Hispanic population of 22.6%. Minority populations were not diluted in District 25.

Senate District 29 in Sedgwick County has been retained. District 29 is represented by a Black senator. In 2012, District 29 had a Black voting age population of 24.3%. In 2022, it retains a 26.2% Black percentage. Senate District 29 also has a significant Hispanic population. In 2012, the Hispanic population in District 29 was 23.8%. In the 2022 plan, District 29 has a Hispanic voting age population of 22%. Minority populations were not diluted in District 29.

Given this, none of the Kansas senatorial districts created in 2022 Substitute for Senate Bill 563 violate the provisions of the Voting Rights Act. And no one has challenged the senatorial map on this ground.

Because there are more House districts to examine than the Senate, below we provide two charts showing population changes between 2012 and 2022 in House districts with significant Black and Hispanic populations:

*Black population in relevant Wyandotte (W) and Sedgwick (S) County House districts:*

| District | 2012 | 2022 |
|----------|-------|-------|
| 34 (W) | 37.5% | 36.1% |
| 35 (W) | 40.2% | 43% |
| 36 (W) | 23.2% | 22.5% |
| 84 (S) | 33% | 32.3% |
| 89 (S) | 29.8% | 30.1% |

*Hispanic population in relevant Wyandotte (W) and Sedgwick (S) County House districts:*

| District | 2012 | 2022 |
|----------|-------|-------|
| 31 (W) | 31.5% | 34.1% |
| 32 (W) | 59.9% | 57.2% |
| 34 (W) | 32.3% | 34.5% |
| 92 (S) | 23.7% | 23.1% |
| 103 (S) | 40.4% | 40.7% |

As these numbers demonstrate, none of these House districts has been subject to minority vote dilution. Additionally, some of the public comment received suggested

14

possible minority vote dilution in other districts. After a careful examination, however, we find there is no evidence that the Legislature engaged in unacceptable techniques such as racially gerrymandering, cracking, or packing minority districts when it redrew the House and Senate districts. No evidence has been presented of "invidious discrimination against any group of the state's citizens which would impermissibly impair their constitutionally protected right to vote." *In re House Bill No. 2620*, 225 Kan. at 841. We therefore find Sub. SB 563 does not violate section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

CONCLUSION

As this court has previously stated: "It is not a perfect plan. No district apportionment plan ever is." 225 Kan. at 840-41. We hold that Sub. SB 563 passes constitutional muster. The Legislature used the procedure required by the Kansas Constitution to pass the bill. The legislative maps contained in Sub. SB 563 also satisfy the constitutional requirement of one person, one vote; they are not discriminatory; they satisfy the requirements of the Voting Rights Act; and they raise no additional constitutional concerns.

Judgment is entered upholding the validity of Sub. SB 563.

15